ROGERS v. PAGE et al.

(Circuit Court of Appeals, Sixth Circuit. November 6, 1905.)

No. 1,389.

1. BANKRUPTCY—VOIDABLE PREFERENCE—DEBT SECURED BY UNRECORDED MORTGAGE.

Under the law of Tennessee an unrecorded mortgage is valid as between the parties, where given in good faith to secure a valid debt, and, where such a mortgage was.given more than four months prior to the mortgagor's bankruptcy, its payment within such four months does not constitute a voidable preference.

2. SAME—ACTION BY MASTER TO AVOID PREFERENCE—ISSUES AND PROOF.

Where, to a bill by a trustee in bankruptcy to recover money paid to defendant by the bankrupt as an unlawful preference, defendant answered, setting up as a defense that the payment was in satisfaction of a debt secured by a mortgage given more than four months prior to the bankruptcy, the validity of said mortgage is in issue, and the burden on such issue is on the defendant.

3. SAME—MORTGAGE—GOOD FAITH—EFFECT OF AGREEMENT NOT TO RECORD.

Good faith, as well as a valuable consideration, is essential to the validity of a mortgage, and while an agreement to withhold it from record is not of itself such evidence of a fraudulent purpose as to constitute fraud in law so as to set aside the mortgage in a suit by a trustee in bankruptcy, it is a circumstance constituting more or less cogent evidence of a want of good faith, according to the particular situation of the parties and the intent as indicated by all of the facts and circumstances of the case.

4. SAME—VOIDABLE PREFERENCE—PAYMENT OF INVALID MORTGAGE.

A mortgage by an insolvent debtor in favor of his brother, purporting to secure advances made and to be made, which was not delivered until two years after it was signed, and then under an agreement that it should not be recorded until necessary for the protection of the mortgagee, and which was in fact never recorded, the property having been conveyed to the mortgagee by the mortgagor a few days prior to his bankruptcy, held, under the evidence, not to have been given with an intention that it should constitute a lien until recorded, nor in good faith, so as to constitute a valid lien against the mortgagor's creditors in bankruptcy; and the conveyance of the property held a voidable preference.

5. SAME—SUIT TO RECOVER PREFERENCE—EXTENT OF RECOVERY.

In a suit by a trustee in bankruptcy to recover an unlawful preference, only so much is recoverable as is necessary for the payment of claims and the costs and expenses of administering the estate.

6. ALTERATON OF INSTRUMENT.

Any presumption which may exist that an alteration discoverable by inspection and unexplained by the instrument itself was made before delivery is rebutted by any other suspicious circumstance, and the burden is upon the party introducing or relying upon such altered instrument to explain.

Appeal from the District Court of the United States for the Eastern District of Tennessee.

This is a bill by the trustee in bankruptcy of I. B. Merriam to recover the purchase price of a tract of coal land alleged to have been sold and conveyed by the bankrupt to his brother, Thos. Merriam, within four months of bankruptcy, for the purpose of preferring said Thos. Merriam by the application of the price to the payment of an alleged indebtedness to the purchaser, contrary to the provisions of the bankrupt act. There was a decree holding the application of the purchase price to have been a preference, and requiring the executor of Thos. Merriam to pay to the complainant a sum sufficient to pay the bankrupt's unsecured debts. The complainant appealed, because the court did not require the full amount of the purchase money to be paid to him, and the executor of Thos. Merriam has appealed from the entire decree.

Williams & Lancaster and Pritchard & Sizer, for appellant.

King, Waters & Page and Brown & Spurlock, for apellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge (after stating the facts). The facts as we find them to be upon the weight of the evidence, necessary to be preliminarily stated, are these:

1. On January 1, 1903, I. B. Merriam, the bankrupt, and C. H. Jarnagin, being joint owners of a tract of coal land situated in Cumberland county, Tenn., joined in a sale and conveyance of same to Thos. Merriam, a brother of the bankrupt. For the undivided interest of I. B. Merriam, Thos. Merriam agreed to pay $65,000 in money and $20,000 in the stock of the Tennessee Lumber & Coal Company, a corporation to which Thos. Merriam immediately sold and conveyed the land. This purchase price was appropriated by agreement between the parties as follows: (a) In clearing the title by acquiring a small interest in a part of the land owned or claimed by one Wright, $5,400. (b) By discharging a lien upon the bankrupt's interest in favor of the Chattanooga Savings Bank, $2,000. One of the conditions of the sale was that the above prior liens should be paid off, so that the remainder of the purchase price is alone involved in the question of an unlawful preference. The shares of stock thus received were immediately pledged to Thos. Merriam to secure him as indorser of a note for $10,000, that day made and discounted by I. B. Merriam in a bank at Rochester. The remainder of the cash proceeds of sale, after providing for the two superior liens mentioned above, and the proceeds of the new note indorsed by Thos. Merriam, were applied and appropriated as follows: First, to the payment of an alleged indebtedness of I. B. Merriam to Thos. Merriam; second, to Thos. Merriam's exoneration as security or indorser upon

obligations of I. B. Merriam to a bank at Rochester, N. Y., the residence of Thos. Merriam; third, to the exoneration of Thos. Merriam, as security or indorser for I. B. Merriam or I. B. Merriam & Son, upon paper outstanding at Chattanooga, the place of residence of the bankrupt. The funds with which these latter payments were made were placed in the hands of I. B. Merriam, bankrupt, with the distinct agreement that Thos. Merriam should be protected by the payment of the claims upon which he was liable.

It is possible that out of the gross sum of $75,000 in money arising from the sale of the land, including the $10,000 raised by pledge of the shares of stock received as part of the price, that a few thousand dollars, not exceeding $10,000, was used by the bankrupt for purposes other than the protection of his brother; for the evidence is not clear or detailed as to the sums retained in the first instance by Thos. Merriam on account of the indebtedness of I. B. Merriam to him or for the purpose of paying off claims at Rochester upon which he was liable in some form of suretyship. Neither is the evidence satisfactory as to the precise amount of the claims paid off at Chattanooga by I. B. Merriam out of the proceeds of sale under his agreement to protect his brother by such application of that part of the price brought to Chattanooga from Rochester. At the time of this transfer and appropriation I. B. Merriam was hopelessly insolvent, and within 10 days he filed his voluntary petition to be adjudicated a bankrupt, and was so adjudged. His assets consisted of a number of parcels of real estate situated in Chattanooga, all mortgaged for their full value or more, and a remnant of a stock of merchandise belonging to the firm of I. B. Merriam & Son, appraised at $1,800. The debts of I. B. Merriam individually and of I. B. Merriam & Son, excluding debts due to Thos. Merriam, or secured by him, and wholly unsecured, aggregate approximately $50,000, with no assets to apply to their payment if the purchase price of this coal land be excluded. It is therefore evident that when I. B. Merriam agreed to apply the proceeds of the sale of this land in exoneration of Thos. Merriam as his surety, and in payment of the alleged indebtedness to him, that he was hopelessly insolvent and could not but know that such was the case. Neither was this a recent condition, for the evidence satisfactorily shows that for several years he had been in failing circumstances, and that his creditors were held off only by the apparently unincumbered condition of his coal lands, and the constant promise that he was about to dispose of them for a price which would pay all of his debts and disencumber his Chattanooga property.

2. Neither do we see any reason for disagreeing with the court below in respect to its conclusion that Thos. Merriam was aware of his brother's condition at the time he bought the land here involved, or of such suspicious facts as to charge him with inquiry and notice of such facts as he might have learned by an inquiry conducted in good faith. The bankrupt was his brother. For several years he had been supporting his credit, both by endorsements and by lending him money. He claims that as far back as 1897 he had taken his brother's note for $35,000, secured by an unrecorded mort-

gage upon his undivided interest in this coal land. This note he claims was for moneys theretofore loaned his brother from time to time which at the time the note and mortgage were given approximated $25,000, and for additional sums which he might thereafter lend him. This debt grew by reason of further alleged loans and through accumulation of interest until it approximated $44,000 at the date of payment, January 1, 1903. In addition to this, he claims to have incurred liability for him to the extent of probably $15,000 more. That his brother's affairs were not prosperous and that his debts were increasing he was bound to know from the nature of his own transactions with him. It is true he did not live at Chattanooga, but he occasionally visited his brother and concedes some degree of knowledge touching other indebtedness of the bankrupt. His deposition in support of his defense has been carefully read. It is neither full nor frank, and impresses us with the conviction that he was aware of the precarious condition of his brother's affairs as far back as September, 1897, when he claims to have demanded a mortgage upon this coal land. That he should agree not to record the instrument then taken until he should deem it necessary for his own protection is significant of his knowledge of his brother's condition and of the effect upon his credit if recorded. The very fact that after carrying his brother for years he should demand the immediate payment of his entire debt out of the proceeds of the sale of this land, and his exoneration from liability as surety by the payment of every debt upon which he was bound, admits of but one explanation in the light of this evidence, and that is that he knew his brother was insolvent, and that, if he was not thus preferred, he would lose a large part of his debt. The mere fact that the mortgage of 1897 was not recorded does not, under the law of Tennessee, affect its validity, except as to creditors and purchasers without notice, if it was made for a valuable consideration and in good faith.

As between the parties to the instrument, it was, if made and held in good faith, a perfectly valid security. Shannon's Tennessee Code, § 3749; Grady v. Sharron, 6 Yerg. 320; Hays v. McGuire, 8 Yerg. 92; Green v. Goodall, 1 Cold. 404; Woods v. Bonner, 89 Tenn. 411, 18 S. W. 67. Being a valid security under the law of the state, it was entirely competent for the mortgagee to demand and receive payment, or to enforce his lien in default, and, if foreclosure occur or payment is received by the voluntary action of the mortgagor before the property is seized by creditors or impounded as a consequence of an adjudication in bankruptcy, the transaction will not be a preference, provided the unrecorded lien was created more than four months before adjudication. The preference over other creditors in such case was given when the mortgage was executed and delivered. Sabin v. Camp (C. C.) 98 Fed. 974; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956. It follows that if the defendant has shown an appropriation of a part of the purchase price of the bankrupt's coal land in satisfaction of a valid indebtedness secured by an unrecorded lien made, accepted, and held in good faith, more than four months before the filing of the mortgagor's voluntary petition in bankruptcy, he may escape a decree against him to that extent.

**3.** The real controversy is as to whether the unrecorded security set up by the defendant was a valid, good-faith instrument. But, before considering this question of fact, it is necessary to determine whether the good faith of this unrecorded mortgage is open to question under the pleadings. The defendants very strenuously insist that its validity is not attacked by any pleading, and hence it is not subject to investigation. The original bill charges that the conveyance by the bankrupt of his interest in this tract of land only eight days before filing his petition to be declared a bankrupt was a conveyance "made and contrived of malice, fraud, covin, and collusion to the intent and purpose, to hinder, delay and defraud creditors of said bankrupt of their lawful and just actions, suits, debts and acts and therefore wholly null and void," and that said Thomas Merriam was aware of the fraudulent purpose of his brother and accepted the deed in order to aid him in defrauding his creditors. Upon this theory, the land having been at once sold and conveyed by Thomas Merriam to a coal mining corporation, the bill seeks to recover the value of the interest of the bankrupt.

But the bill also proceeds upon the theory that the defendant claims to have appropriated the agreed price of the land "in liquidation of claims or demands" that said defendant had against the bankrupt. If this be true, says the complainant in his bill, then such an appropriation was an unlawful preference, the grantor being insolvent and intending a preference, and his intent being known to the purchasing creditor. The prayer of the bill is, first, that the sale and transfer be decreed null and void as made in fraud of creditors, or, second, if mistaken in this, that the appropriation of the price to the satisfaction of debts due to the defendant be declared an unlawful preference, etc. After denying all averments of fraud in fact and of knowledge of the insolvency of the bankrupt or intent to procure a preference forbidden by the bankrupt law, the answer proceeds as follows:

"Defendant further alleges affirmatively by way of defense to said petition that the facts concerning the transaction between this defendant and said bankrupt are as follows: That this defendant has loaned from time to time, since, during, or about the year 1892, to said I. B. Merriam various sums of money, and has indorsed various notes for said I. B. Merriam. That during the summer of 1897, the said I. B. Merriam executed and delivered to the trustee therein named, for the benefit and security of this defendant, a trust deed conveying all his interests in the lands mentioned in said petition herein for the sum of $25,000 which trust deed was executed, delivered, and accepted as and for a complete and continuing security to this defendant for any and all sums of money which he might loan to said I. B. Merriam, and as and for a continuing security to this defendant for any liability which he might incur by reason of indorsing notes or other commercial paper for said I. B. Merriam. That thereafter, and on or about the 11th day of April, 1899, said bankrupt executed and delivered to this defendant for the security of defendant another trust deed, conveying the same property which was and was intended to be continuing security for the benefit of this defendant for any indorsement which he might make for said I. B. Merriam and for any and all sums of money which he might loan him to the amount of $35,000, and interest. And said deed was thereafter delivered by this defendant to the trustee therein named in said month of April, 1899. That this defendant loaned to and indorsed for said I. B. Merriam from time to time to the amount of $55,000. That said I. B. Merriam had endeavored repeatedly to sell said coal lands, but without success. That during or about the month of December, 1902, defendant entered into an

agreement with said I. B. Merriam, by the terms of which this defendant was to enter into possession of said premises and negotiate a sale of the same, if possible, and out of the proceeds of said sale first pay himself the amount due for money loaned and take up such paper as he was liable on as indorser and for all of which he was secured by the trust deed aforesaid. That in pursuance of said arrangement this defendant made a sale of said premises, took title thereto from said I. B. Merriam, and out of the purchase price of $65,000 paid the debt to him, this defendant, and notes on which he was accomodation indorser in bank of Syracuse to the amount in all of $42,000 or thereabouts, and paid over to said I. B. Merriam in cash the sum of $25,032 or thereabouts. That after such transaction was completed defendant was informed by his said brother, I. B. Merriam, that he was not going to have sufficient money to pay all of his debts, and the defendant inquired of his said brother as to the amount he would require in addition and was told that he would require $10,000, and with said sum he could pay all his creditors and would be in comfortable circumstances and could keep his Chattanooga real estate. That thereupon this defendant loaned to said I. B. Merriam the sum of $10,000 in addition to the $25,032, which he has turned over to him out of the proceeds of said property."

The answer concludes as follows:

"That the lands to which this defendant so took title were lands upon which this defendant had perfect security and a valid lien under and by virtue of the trust deeds hereinbefore referred to and as to which lands no other creditors had or could acquire any lien or title whatever. Wherefore defendant prays that the petition and the bill of petitioner and complainant herein be dismissed, with costs, and that it be adjudged that this defendant obtained no unlawful preference as against the creditors of said I. B. Merriam, and that defendant obtained from said I. B. Merriam a perfect title to the lands described in the petition herein."

The issues thus made are, first, the general fraudulent character of the conveyance of June 1, 1903; second, if not fraudulent, that the appropriation of the agreed purchase price in payment of the claims of the grantee and in his exoneration as a surety was an unlawful preference under the bankrupt law.

As a defense to this charge of an unlawful preference the defendant sets up an unrecorded secret lien given more than four months before bankruptcy, and in effect says:

"This was a valid bona fide lien, good between the parties although unrecorded, and made more than four months before bankruptcy, and the application of the purchase money in discharge of such a lien was not a preference."

The defense is a good one, but the burden of establishing the existence of such a valid pre-existing lien is upon the defendant, who thereby seeks to escape liability as for a preference. This was the view of Judge Clark, and in his conclusion we concur.

Conceding that the evidence shows that I. B. Merriam was indebted to his brother in September, 1897, to the extent of approximately $25,000, as now claimed, and that his debt was from time to time increased until it approximated $44,000 in June, 1903, there remains the question as to whether there existed at the latter date any valid bona fide lien for the security thereof made more than four months before that time. That there ever was an unrecorded mortgage upon this land in favor of Thos. Merriam appeared for the first time in his original answer, an answer prepared and filed in his lifetime and the pleading upon which all the evidence was taken upon which this case was heard. That answer set up and claimed a right to

appropriate the purchase price of this land under two distinct mortgages, both made several years before bankruptcy, and neither corresponding in essential particulars to the single mortgage produced and relied upon at the hearing. One, he says, was made in the summer of 1897 to secure $25,000, as a "continuing security to this defendant for any and all sums of money which he might loan to I. B. Merriam, and as and for a continuing security to this defendant, for any liability which he might incur by reason of indorsing notes or other commercial paper for said I. B. Merriam." Another, he says, was made on or about April 11, 1899, conveying same property, "which was intended to be a continuing security for the benefit of this defendant for any indorsement which he might make for said I. B. Merriam, and for any and all sums of money which he might lend him to the amount of $35,000 and interest. And said deed was thereafter delivered by this defendant to the trustee therein named, in said month of April, 1899."

The instrument under which the defendant claims a lien more than four months antecedent to the bankruptcy of I. B. Merriam is a mortgage purporting to have been executed September 24, 1897, to Thos. M. Merriam, as trustee, to secure a note made by I. B. Merriam of even date to Thos. Merriam for $35,000, payable one year after date, without interest. A note of same date and for $35,000, signed by I. B. Merriam and payable to Thos. Merriam, has also been produced in evidence. This mortgage does not correspond in date with either of the mortgages or trust deeds set up in the answer. The depositions of both Thos. and I. B. Merriam were taken at large, and each undertook to show the amount of indebtedness of the bankrupt to Thos. Merriam. They both testify to the execution of the instrument in evidence, but neither pretends that any other mortgage was ever made and neither in any way undertakes to explain the averments of Thos. Merriam's answer in respect to the lien relied upon to defeat the claim for recovery of the price of this land as a preferential appropriation. That the instrument produced was originally written to secure a note for $25,000, and that it has been altered so as to make it secure a note for $35,000, is apparent from a careful examination of the original instrument, which constitutes a part of the record in this case.

Whether in the absence of suspicious circumstances a presumption would not exist that an alteration discoverable by inspection was not made at the time of execution we need not decide. The question at last is one of fact, for this court to determine upon all the facts and circumstances; this being an appeal in equity. There are two circumstances which tend to rebut any presumption of an alteration contemporaneous with the execution of the paper. The first is that the ink used in making the alteration is of a darker color than that of the body of the instrument. This suggests the use of a different ink or an alteration materially later than the writing in the body of the paper. It may be that the alteration was made before delivery, but after the original paper had been drawn. It may be that it was made after delivery by consent of the parties, and for the purpose of enlarging the security because the debt had been enlarged. There

should have been an explanation. There is none, save that counsel say these alterations were not drawn to their attention until argument of the case below.

But, even then, no effort was made to explain, and the court is left to conjecture when and why so material an alteration should have been made. The other circumstances of suspicion in view of this alteration, is the fact that the orginal answer set up two distinct mortgages, one to secure a $25,000, and another to secure a $35,000 note. There is now no pretense of an independent mortgage to secure $25,000, but reliance is placed upon a mortgage originally drawn to secure a debt of $25,000, which has been altered to secure a $35,000 debt, and yet does not correspond in date with that described in the answer. An alteration by consent of both parties of an instrument to secure $25,000 to one securing a debt of $35,000 may have left an impression in the mind of Thos. Merriam, in the absence of the instrument, that he had had two independent mortgages, one for $25,000, and the other for $35,000, and that he instructed his counsel as to the facts to be stated in his answer while laboring under this impression. Whatever the truth of the matter, there is no adequate explanation of this surprising variance between the answer and the evidence or of the alteration of the mortgage produced in so material a matter as the amount of the lien created. The case went to a hearing upon the allegations of the answer, setting up two distinct mortgages, neither of which correspond with the single mortgage in evidence. After the hearing the defendant died. Whereupon, while the case was under advisement, his executors, the present appellants, came in and asked to have the cause revived against them. They at the same time obtained leave to amend the answer of the deceased testator in respect to the lien justifying his appropriation of the purchase price of the bankrupt's coal land by making it to read:

"That the deed of trust executed by I. B. Merriam, to secure the note of $35,000 which was dated September 24, 1897, was of even date with said note and also dated September 24, 1897, *and was the only deed of trust executed by I. B. Merriam to secure the indebtedness due from him to Thos. Merriam in June,* 1903." The italics are ours.

This amendment was allowed upon the affidavit of Mr. E. J. Page, the lawyer who drew Mr. Thos. Merriam's answer and took his deposition. That affidavit amounts to nothing more than an expression of Mr. Page's opinion that, as the answer was unsworn, and Mr. Merriam in delicate health, he probably misunderstood his client's instructions in regard to the facts, and that in the taking of the evidence he had not discovered the discrepancy between the answer and the evidence in this matter. As tending to throw further suspicion upon the bona fides of the mortgage under which Thos. Merriam's appropriation of so large a part of the purchase price of this land is sought to be justified, the evidence strongly tends to show that the mortgage, whether for the one sum or the other, was never intended to constitute an immediate security for the debt existing at its date or to be created thereafter. It was never recorded, and remained a secret lien until disclosed during the bankruptcy proceedings. The transaction was between brothers. The son of the

bankrupt was the trustee. Not only was its existence kept secret, but existing and subsequent creditors were lulled into inactivity by repeated assurances from the mortgagor that this coal land was unincumbered, and that he was about to make a sale of it, and that the proceeds would pay all of his debts and leave his other property unincumbered. Indeed, just prior to the actual sale to his brother, and while that was being negotiated, he assured several of his local creditors that he was about to sell, and upon his return from the East would be able to settle with all of them. He went East, concluded the sale to his brother, and returned with only the money necessary to pay off obligations upon which Thos. Merriam was bound, having received it from his brother under pledge to use it in that way only. This done, he at once applied to be declared a bankrupt.

At the date of this mortgage, September 24, 1897, the mortgagor was, as we have before stated, actually insolvent. All of his realty, other than this coal land, was mortgaged for its full value or more. He had a heavy unsecured debt to his brother and others; the debt to his brother then approximating $25,000. He was in business as a grocer. But that business was then dwindling for want of capital to carry it on. He entertained the hope that Chattanooga real estate would recover the values which prevailed when he acquired his Chattanooga real estate, and that, if he could hold on, he might or would save himself. This much his brother knew. His own loans were confessedly to enable him to tide over a period of depression by enabling him to continue business and hold on to his speculative, but mortgaged, investments. In this situation Thos. Merriam demanded a mortgage upon the only unincumbered property of any important value owned by his brother, a mortgage not to secure a loan presently made, but a debt which had been growing for years, and to secure such other advances as he might thereafter make. And so a note for $35,000 was taken, and a mortgage to secure same, though only $25,000, was then owing. This unmortgaged coal land was then and for years afterward the chief prop upon which I. B. Merriam's credit leaned and by which he was able to hold his creditors off. In this condition of things the disclosure of a debt of $35,-000 to Thos. Merriam and a mortgage to secure it would in all human probability precipitate matters and bring down upon him every creditor he had.

The mortgage purports to have been drawn and acknowledged September 24, 1897, but was not delivered until some time in 1899. Some time in the year last mentioned Thos. Merriam visited Chattanooga. The mortgage was then, as we understand the evidence, placed in the hands of Thos. M. Merriam, a son of the bankrupt, his partner in business and the trustee named therein. This delivery, if such it was, was under an agreement that the instrument should not be recorded until such time as it should become necessary for the protection of the Merriams. This agreement Thos. Merriam says was made after he had had the trustee obtain the opinion of counsel as to its effect upon the validity of an unrecorded lien. Now, was it intended that this mortgage should at once become an existing specific lien upon the lands described therein from and after Septem-

ber 24, 1897, for the sole and single purpose of securing the debt then due and advances thereafter to be made, an intention to make such further loans being in no way disclosed, or was it intended as a prospective security to become effective as such by registration at such time as the interests of the beneficiary should require? That it was not intended to become effective when made and dated is plain from the fact that it was not delivered for perhaps two years, and when it was placed in the hands of the trustee, the bankrupt's son and partner, it was subject to the agreement against registration. If the meaning of what then occurred was that the instrument was to be held by way of escrow, becoming effective as a specific lien only in the event the affairs of I. B. Merriam should get into such a situation as to require the protection of his brother by putting this agreement for a mortgage into effect as a specific loan, there would be no reason for claiming that it ever came into effect prior to June 1, 1903, and then only as a consequence of an agreement of the parties then made. That it was the purpose of the parties that it should only go into effect as a lien when registered is most consistent with the conduct of the parties, and this was the conclusion of the court below, and in this we are disposed to concur.

Taking all the facts and circumstances of the case together, we are not convinced that the court below erred in holding this mortgage invalid for want of good faith, irrespective of whether it was intended to go into effect when delivered in 1899 under the agreement against registration. That agreement, we are convinced, was made for the purpose of enabling I. B. Merriam to hold himself out as the owner of this coal land. This he did. He was thereby enabled to continue in business for several years; his debt constantly increasing. The fact that this was a secret lien gave this property the appearance of being unincumbered, and was the moving inducement of some of his existing creditors to grant delay by extension and renewal. The debtor actively represented this land as an available asset which he was in constant expectation of selling, and that the proceeds would pay all his debts and disincumber his other property. These representations operated to quiet his existing creditors and to obtain from some of them extensions and renewals and new credit in at least one proven case. Neither is the unexplained alteration of the mortgage, aside from its technical effect as an alteration, consistent with a bona fide purpose to secure a lien for an honest debt. These facts and others, not so important, but yet of some weight which appear in the transcript, convince us that the lien claimed was not a bona fide lien of more than four months' existence at date of bankruptcy. That good faith, as well as a valuable consideration is necessary to sustain a mortgage or conveyance against creditors, has been considered as essential ever since Twynes' Case, 3 Coke, 80; Davis v. Schwartz, 155 U. S. 631, 638, 639, 15 Sup. Ct. 237, 39 L. Ed. 289; Story, Eq. 353.

The mere fact that a mortgage has by negligence been omitted from registration does not avoid it as between parties. Cowan v. Gill, 11 Lea (Tenn.) 674; Blennerhassett v. Sherman, 105 U. S. 100, 111, 26 L. Ed. 1080; In re Shirley, 112 Fed. 301, 50 C. C. A. 252; Insur-

ance Co. v. Shoemaker, 95 Tenn. 78, 83, 31 S. W. 270. But there is a distinction between a mere negligent failure to record a mortgage or deed and a deliberate agreement to do so, although the mere fact of an agreement to withhold from record is not of itself such evidence of a fraudulent purpose as to constitute fraud in law. It is, however, a circumstance constituting more or less cogent evidence of a want of good faith, according to the particular situation of the parties and the intent as indicated by all of the facts and circumstances of the particular case. 14 A. & Eng. Enc. Law, p. 526; Story, Eq. § 363; Bigelow on Fraud, p. 88 et seq.; Brown v. Easton (C. C.) 112 Fed. 592; Corwine v. Thompson N. Bank, 105 Fed. 196, 44 C. C. A. 442; Cadogan v. Kennett, 2 Cowp. 432; Davis v. Schwartz, 155 U. S. 631, 639, 15 Sup. Ct. 237, 39 L. Ed. 289; Blennerhassett v. Sherman, 105 U. S. 100, 117, 26 L. Ed. 1080; Hafner v. Irwin, 23 N. C. 490; Hilliard v. Cagle et al., 46 Miss. 309.

The conclusion we reach is that the application of the proceeds of the sale of the bankrupt's interest in this coal land to the debts and claims of Thos. Merriam, and, at his demand, to debts and claims upon which he was liable for the purpose of exonerating him, were preferential payments to Thos. Merriam for which his executors must account with interest, if that sum be necessary for the payment of all debts of every class which have been or may be proven against the bankrupt and the expenses of the trustee, his fees and the costs of the bankrupt cause. But only to the extent necessary to the payment of claims, costs, and expenses is there any equitable reason for recovering the preferential payment received by Thos. Merriam. The cause will be remanded, and the decree so modified as to direct the ascertainment of the money necessary for the purposes indicated, whereupon to enter a decree against the executors of Thos. Merriam, for the sum thus settled, not, however, to exceed the amount applied by Thos. Merriam in payment of his own claims and that which by his insistence was applied in his exoneration as surety or indorser.

The costs of this appeal will be paid by the executors of Thos. Merriam.