## IN RE SHAW.

(District Court, D. Maine. July 5, 1906.)

No. 4.203.

1. CHATTEL MORTGAGES—VALIDITY—TRANSFER OF POSSESSION—SUFFICIENCY—VALIDITY OF LIENS.

A bankrupt, who operated a tannery in Maine, some two years prior to the bankruptcy executed a chattel mortgage to a creditor on all the stock and materials at his tannery and such as should thereafter be acquired. By agreement the mortgage was not recorded, nor was any possession ever taken thereunder. Subsequently the mortgagee made a mortgage to secure an indebtedness to a bank on certain bark at the bankrupt's tannery, to which it had no title unless by virtue of its own mortgage. Also, by agreement, this mortgage was not recorded, but an attempted delivery of possession was made by going to the tannery, scaling the bark, and placing on each pile a small board, having thereon a letter of the alphabet, and then formally delivering each pile to the agent of the bank, who appointed the bankrupt its custodian. There was no visible change of possession, and the bankrupt's trustee took possession of and sold the bark as assets of his estate. *Held* that, under Rev. St. Me. c. 93, § 1, which provides that "no mortgage of personal property is valid against any other person than the parties thereto unless possession of such property is delivered to and retained by the mortgagee or the mortgage is recorded," there was no such delivery and retention of possession as to validate either mortgage, but that both were fraudulent as attempted secret liens, and void as against the bankrupt's trustee.

2. BANKRUPTCY—FRAUDULENT TRANSFERS—RIGHTS OF TRUSTEE—EFFECT OF ESTOPPEL OF BANKRUPT.

The estoppel of a bankrupt to deny the validity of a lien on his property does not affect his trustee, where such lien was voidable by his creditors.

In Bankruptcy. On review of decision of referee.

Charles K. Cobb, for the National Exchange Bank of Boston, Mass.

Joseph W. Lund, for Jos. W. Lund, trustee of W. S. Keene Leather Co. of Boston, Mass.

Powers & Archibald, for George A. Gorham and Willis I. Shaw.

HALE, District Judge. This case comes before the court upon the report of Edwin L. Vail, Esq., one of our referees in bankruptcy. The report is as follows:

"I, Edwin L. Vail, the referee in bankruptcy in charge of this proceeding, do hereby certify that in the course of such proceeding an order, a copy of which was annexed to the petition hereinafter referred to, was made and entered on the 30th day of August 1905; that Joseph W. Lund, as trustee in bankruptcy of the W. S. Keene Leather Co., a party in interest, feeling aggrieved thereat, filed a petition for review, which was granted; that the National Exchange Bank of Boston, a party in interest, feeling aggrieved thereat, also filed a petition for review, which was granted; that a summary of the evidence upon which said order was based, together with a review of the case, as follows: This is a controversy over the title to 1,844.27 cords

146 F.—18

of hemlock bark, situated in the town of New Limerick, Me., which said bark was at one time unquestionably the property of Willis I. Shaw, the bankrupt in this case. There are three claimants to this property or the proceeds of the sale of the same: First. George A. Gorham, Jr., of Houlton, Me., trustee in bankruptcy of Willis I. Shaw, claims title as said trustee. Second. Joseph W. Lund, of Boston, trustee in bankruptcy of the W. S. Keene Leather Co., claims title as said trustee by virtue of a certain chattel mortgage hereinafter referred to. Third. The National Exchange Bank of Boston claims title by virtue of a certain chattel mortgage hereinafter referred to. The bark in controversy was sold by George A. Gorham, Jr., as trustee of Willis I. Shaw, and the following was agreed to by all parties in interest: 'It is hereby agreed and stipulated that the bark in controversy and contended to be secured by its mortgage when scaled was found to contain 1,844.27 cords, and that number of cords was sold at $5 per cord by the trustee of Willis I. Shaw with the consent of all parties in interest.' A further agreement was entered into between the parties in interest, wherein they agreed to submit this controversy to this court for determination; all questions of jurisdiction being waived, reserving only the right of appeal. Said agreement is herewith inclosed, and marked 'Exhibit 7, E. L. Vail Referee.' This matter came on for a hearing before me after several continuances on the 19th day of May, 1905. The three parties in interest were present with their counsel, as more fully appears by the examination and records in this case. The said Willis I. Shaw was adjudged a bankrupt June 25, 1904, on his petition filed June 21, 1904. The title of Joseph W. Lund, trustee of W. S. Keene Leather Co., to the bark in question is claimed by virtue of a certain chattel mortgage given by Willis I. Shaw to W. S. Keene Leather Co., and dated March 10, 1902, which said mortgage was never recorded in the town records of the town of New Limerick, nor possession taken under said mortgage. This mortgage was given for the amount of $97,344.13, the balance due the W. S. Keene Leather Co. from the said Willis I. Shaw, as appeared by the books of said Keene Leather Co. This mortgage is herewith inclosed, and marked 'Exhibit 11, E. L. Vail Referee.' The first clause of said mortgage, after reciting the consideration, reads as follows: 'All hemlock bark that I now have on hand at my tannery at said New Limerick, also all hemlock bark that I shall hereafter acquire in the usual and ordinary course of my business as a tanner at said New Limerick, for the purpose of running my tannery at said New Limerick, purchased from the proceeds of the using up in said tannery business my bark now on hand in tanning leather, and from receipts from said bark through the tanning of leather at said tannery.' The mortgage in the same manner attempts to cover all materials used in the tanning business, including stock on hand, horses, carriages, carts, and wagons. On May 10, 1902, before the execution of the above mortgage, Willis I. Shaw, so far as the records in this case show, unquestionably had an absolute title to the property covered by the mortgage, and had a perfect right to mortgage the same. In order to part with that title, either absolutely or conditionally, there must be a transfer of said property or a public record. In the present case the mortgage was never recorded, and there is no claim that possession was taken under the same. Therefore, I do not consider the title of the trustee of the W. S. Keene Leather Co. of sufficient strength to demand any lengthy discussion at the present time.

"Now as to the claim of the National Exchange Bank. On January 23, 1904, the W. S. Keene Leather Co. was indebted to the National Exchange Bank of Boston for moneys previously advanced without security on a line of credit previously arranged and limited to $25,000. About January 23, 1904, the bank demanded security, claiming as a reason that certain notes of the Keene Co. were found in the hands of note brokers of questionable financial reputation. Mr. Cauley, treasurer of the Keene Co., and Mr. W. S. Keene, president of the Keene Co., had a conversation with Mr. Murdock, president of the bank, and agreed to give him a chattel mortgage of certain hemlock bark, about 4,000 cords, situated at the Shaw tannery in New Limerick, Maine. In this conversation it seems to have been agreed that the mortgage was not to go on record, as it might hurt the credit of the

Keene Co. [Examination of J. W. Cauley, page 17.] Mr. Shaw states on page 25 of his examination that it was agreed and understood that the mortgage was not to be recorded. Mr. Whitmore states on page 30 of his examination that it was agreed that the mortgage was not to be recorded, and that in conversation with Mr. Shaw, Mr. Shaw said, 'Of course, this mortgage is not to be recorded.' The Keene Leather Co. has attempted to transfer the title to 4,000 cords of bark by an unrecorded mortgage as above, its own title to the same bark being by virtue of an unrecorded mortgage, wherein there is no assumption of title by possession. After the conversation with Mr. Murdock as president of the bank, Mr. Whitmore as attorney of said bank, and Mr. Keene went to New Limerick for the purpose of executing to the National Exchange Bank the mortgage agreed upon, which purported to secure an indebtedness to the bank of about $25,000. The bark covered by this mortgage was situated in the town of New Limerick, at the tannery yard of Willis I. Shaw, and a delivery of the bark was attempted in the presence of Shaw from the Keene Co. to W. D. Whitmore, as agent or attorney of the National Exchange Bank. The different piles of bark were scaled, and lettered A, B, C, D, E, and F, respectively, on each end of the piles, and then and there Mr. Whitmore delivered said bark contained in the mortgage to Mr. Shaw to hold as the agent of the bank; thus attempting to acquire title to the bark by evading a public record.

"The evidence in this case to my mind clearly shows that a fraud has been attempted. According to Mr. Whitmore's testimony, the entire scheme was blocked out in his office in Boston, including a letter to be signed by Shaw and directed to the bank. At the time this mortgage was given the bank unquestionably controlled the financial destiny of the Keene Co., and the Keene Co., on the other hand, controlled Shaw's financial future. It was a financial necessity for the Keene Co. to secure the bank, as also Shaw's financial existence depended upon his mutely agreeing to any terms which the Keene Co. might dictate. Shaw says, on page 34 of his examination, that he never sold the bark except by mortgage, and there is no evidence to show that he ever parted with the bark, or gave any one sufficient title to give a valid mortgage of the same; and the vital point at issue in the whole case is simply this, could Shaw stand mutely by, and allow the Keene Co. to mortgage the bark in question, regardless of their right to convey title to the same, and is such transaction good as against the creditors of Shaw? To say the least, the transaction is open to the gravest suspicion. Mr. Whitmore, on page 30 of his examination, in reply to a question by Mr. Archibald, 'What is the conversation with Shaw?' A. (by Whitmore) 'As I recall it, when Mr. Shaw came out from his conference with Mr. Keene, he said to me "Of course this mortgage isn't going on record," and I said "No, it is not. I have drawn papers to effect a delivery and retention by us (meaning the bank), with you acting as our custodian." ' Whitmore, as attorney for the bank, denies that he knew the source of the title of the Keene Co. to the bark. From the above conversation he must have known that Shaw still held enough interest in the same to insist that no record should be made of any mortgage. There was no notice given to any creditor of this transaction other than the bank, and no possession taken except as above. As far as the public and other creditors were concerned, the ownership remained the same as before; Shaw now acting in the capacity of custodian for the bank instead of the real owner. The only attempt at notice was the wooden placards, about six inches square, nailed to each end of the piles. The bark was taxed to Shaw, and his trustee in bankruptcy has already paid the tax. The placards placed on the ends of each pile were evidently placed there for the purpose of evading notice rather than to give it. What notice could possibly be given to the public or to creditors of a change of title simply by nailing up placards with certain letters upon them? It might be a scaler's identification as to the scaling of the bark, or for numerous other reasons, any one of which would be as reasonable as notice to the public of a sale. No one was qualified or authorized to explain the meaning of the notices, and it was certainly intended that no one except Shaw, Keene, and the bank should know of the transfer at least until four months had elapsed. If parties in-

tend to rely upon possession and retention rather than a public record, it had been repeatedly held in Maine and Massachusetts that it must be an open and notorious possession and retention of the goods. The case of Moors v. Reading, 167 Mass. 322, 45 N. E. 760, 57 Am. St. Rep. 460, has been cited, and I think has some bearing upon the present case. In this case the court says: 'That, even if it be assumed that there was a taking of possession, there was no such retention of possession as satisfied the statute. The purpose of the statute is to prevent mortgagors by means of possession from misleading people into the belief that they are owners.'

"The further question of after-acquired property is involved in this case. Shaw testifies in his examination (page 36) that about one-half of the bark mentioned in his original mortgage to the Keene Co. was on hand in his yards when the mortgage to the bank was given by the Keene Co. True, the mortgage to the bank attempts to cover after-acquired property, but there is no pretense that the Keene Co. took possession under its mortgage of 1902. And in the case of Hamlin v. Jerrard, 72 Me. 62, 78, a case relied upon by the bank's attorneys, the court says: 'At law, although a power is given in a deed of assignment to take possession of after-acquired property, no interest is transferred, even as between the parties, unless possession is actually taken.' If the Keene Co. never took possession of the after-acquired property under its unrecorded mortgage of 1902, it certainly would have no legal right to mortgage this after-acquired property to the bank; and, aside from the question of fraud, a legal title to only one-half of the bark in controversy could pass to the bank. Again, the vote of alleged directors or stockholders of the Keene Co., authorizing the giving of this mortgage, has many suspicious earmarks. First, it is undated. Second, it is signed by J. W. Cauley, clerk, when in fact Frederick Hale of Portland, Me., was the clerk of the corporation. The record does not show whether it is a vote of the directors or the stockholders, nor does it show or describe any particular bark which was to be mortgaged, and no record of the transaction was ever annexed to the vote. The whole transaction was evidently consummated in great haste, for what purpose there can be but one conclusion—to secure the bank at the expense of the creditors of Shaw.

"It further appears from the schedules filed in this case and from the proofs of debt on file that after the giving of this mortgage to the National Exchange Bank January 23, 1904, extensive credit was given to Shaw by creditors who had no possible way of knowing or finding out the existence of the incumbrances on his estate. So far as the records showed, the bankrupt's property, valued at about $100,000, was unincumbered, with the exception of a balance due on real estate to the Dexter Savings Bank of Dexter, Me., of about $1,500. The effect of the enforcement of this transfer to the bank would be certainly to give them a preference over the other creditors of the same class, and in Re Blennerhasset v. Sherman, 105 U. S. 100, 121, 26 L. Ed. 1080, the court say that a transaction similar to this is a fraud upon creditors, and void at common law. If the contention be true that Shaw parted with his title to the bark, and gave the Keene Co. authority to mortgage the same, Shaw should certainly have credit for the same upon the books of the Keene Co. No such credit appears.

"My conclusions, reached from a review of the whole transaction, are that a fraud has been attempted upon the creditors of Shaw, and that an allowance of this mortgage would be a consummation of the fraud. I herewith submit to the honorable court my finding in this case with this review, together with all exhibits and examinations pertinent to the same.

"Respectfully submitted,

"Edwin L. Vail,
"Referee in Bankruptcy.

"Dated at Houlton, Maine, March 5, 1906."

It will be seen from the above report of the referee that this controversy involves the title to about 2,000 cords of hemlock bark, which formed a part of the assets of Willis I. Shaw, and which passed to his trustee in bankruptcy. The proceeds of this bark are now claimed—

first, by Shaw's trustee in bankruptcy; second, by Joseph W. Lund, of Boston, trustee in bankruptcy of the W. S. Keene Leather Company, under a mortgage given by Willis I. Shaw to the W. S. Keene Leather Company, dated March 10, 1902; third, by the National Exchange Bank of Boston, by virtue of a mortgage from the W. S. Keene Leather Company to said bank, dated January 23, 1904.

The referee has sufficiently stated the testimony. It appears that Willis I. Shaw, the bankrupt, had an absolute title to the bark in question at the time he executed the mortgage to the W. S. Keene Leather Company. The claim of Shaw's trustee in bankruptcy is good, unless the claim arising under one or both of the above mortgages is sustained. The property was not delivered to the Keene Leather Company, nor retained by it under the mortgage, and the mortgage was not recorded. Chapter 93, section 1, of the Revised Statutes of Maine, provides that:

"No mortgage of personal property is valid against any other person than the parties thereto, unless possession of such property is delivered to, and retained by the mortgagee, or the mortgage is recorded by the clerk of the city, town, or plantation organized for any purpose, in which the mortgagee resides, when the mortgage is given."

It is clear that the claim of the Keene Leather Company under this mortgage cannot be sustained, as there is no testimony tending to show that the mortgage was ever recorded, or that possession of the property was delivered to and retained by the mortgagee.

In reference to the claim of the National Exchange Bank, it appears by the report that at the date of the mortgage given by the W. S. Keene Leather Company that company was indebted to the National Exchange Bank for loans which had previously been arranged, limited to the sum of $25,000. No new advances were made upon the giving of the mortgage. On that day, the treasurer of the Keene Leather Company, in a conference with the president of the bank, agreed to give him a chattel mortgage of 4,000 cords of hemlock bark, situated in the Shaw Tannery, at New Limerick, Me. The testimony tends to show, also, an agreement, made at this conference, that the mortgage was not to be recorded, for the reason that such record might injure the credit of the Keene Company. After this conference, Mr. Murdock, president of the bank, and Mr. Whitmore, its attorney, went with Mr. Keene, president of the Keene Leather Company, to New Limerick. The bark covered by the mortgage was found at the tannery yard of Willis I. Shaw in New Limerick. The mortgage was executed. A delivery of the bark was attempted from the Keene Company to W. D. Whitmore, as agent of the National Exchange Bank. This delivery consisted in locating the different piles of bark, having them scaled, and attaching to each pile a wooden block, about six inches square. Each of these blocks was marked with a letter of the alphabet. Mr. Keene, Mr. Shaw, and Mr. Whitmore went to these several piles of bark lying in the tannery yard, and Mr. Keene, touching each pile, said, "I deliver to you this pile of bark under the terms of this mortgage, to hold as the agent of the National Exchange Bank." Mr. Whitmore then delivered a letter to Mr. Shaw which had been written in Boston, ap-

pointing Mr. Shaw as the agent of the bank to hold the property. Mr. Shaw then gave Mr. Whitmore a receipt for the bark. No notice of this transaction was given to anybody other than the parties to the transaction. It does not appear that the bark was marked in any way as the property of the W. S. Keene Leather Company, or as the property of the bank, or that any mark indicating proprietorship was placed upon it. There was no delivery of possession other than the delivery as stated above. The yard and the bark remained open as before. Other piles of bark remaining in the yard were used by Mr. Shaw in the course of business. There is nothing in the testimony to indicate that there was any intention that any one except Shaw, Keene, and the bank should know of the transfer of the bark; there was no scaling of the bark by a public scaler, and the bark continued to be taxed to Shaw.

The learned counsel for the bank has contended with great ability and learning that a mortgagee may obtain title by one of two methods pointed out by the statute—either by the recording of the mortgage, or by taking and retaining possession under it—and that possession, taken and retained under the mortgage, was sufficient to validate his title; that Shaw, by standing by and assisting in the delivery of possession, estopped himself, and now estops his trustee, from being heard in court to claim a title to the bark in question.

After a careful review of the case, I cannot sustain the contention of the bank. Under the statutes of Maine, there are alternative methods of obtaining title under the mortgage. It is true that by taking one method it cannot be said that the other method is evaded. Title by either method is equally valid. In the case at bar the mortgage was not recorded. It cannot be claimed, then, that this one of the alternative methods was complied with. The other alternative is that possession of the property shall be "delivered to and retained by the mortgagee." The evidence does not, in my opinion, disclose a state of facts which warrant the court in coming to the conclusion that the bark in this case was delivered to and retained by the mortgagee. The testimony does not disclose an open, notorious, and visible delivery to, and retention by, the mortgagee. Whatever may be said of the action of Shaw being held as an estoppel to himself, it cannot be held to affect the rights of his trustee in bankruptcy. The trustee cannot be regarded to be one of the "parties" to the mortgage. The trustee not only represents the bankrupt, but, under the bankrupt act, he takes the property transferred by the bankrupt in fraud of his creditors, and all property which, prior to the filing of the petition, the bankrupt could by any means have transferred, or which might have been levied upon and sold under judicial process against him. There was no open change of possession resulting from what was done between the Keene Company and the bank and Shaw. There was nothing which would be a notice to creditors, and nothing in the transaction to have prevented creditors from attaching the bark "under judicial process against the bankrupt." I think the testimony reported by the referee to me warranted him in coming to the conclusion which he has stated in his report.

The question as to the compliance with either statute, alternative, is a question of fact. There is no testimony tending to show that the mortgage was recorded, and no claim that such was the fact. When we come to consider the other alternative, the question of delivery to, and retention by, the mortgagee is as distinctly a question of fact. After hearing all the testimony, the referee has decided that there was no such open possession and retention of the property by the mortgagee as is sufficient to comply with the statute. I cannot find that he was in error in coming to this conclusion. In Griffith v. Douglas, 73 Me. 532, 40 Am. Rep. 395, the court held that the mortgage, even though recorded, was not valid unless the goods were delivered by the mortgagor to the mortgagee with the intention to ratify the mortgage, and the mortgagee retained open possession of the after-acquired property until the time of the attachment. Chief Justice Appleton, speaking for the court, said:

"The authorities are uniform in requiring that not merely delivery, but retention of the property delivered, is indispensable to the perfection of the mortgagee's title, whether the mortgage purports to convey after-acquired property or should be unrecorded."

See, also, Wright v. Tetlow, 99 Mass. 397; Moors v. Reading, 167 Mass. 322, 45 N. E. 760, 57 Am. St. Rep. 460; Drury v. Moors, 171 Mass. 254, 50 N. E. 618; Haskell v. Merrill, 179 Mass. 120, 60 N. E. 485.

As I have already said, the testimony in the case at bar does not show such open delivery to, and retention by, the mortgagee of the property as would, in my opinion, have prevented a general creditor from attaching it, and holding it as the property of Shaw. Instead of tending to show an open transfer to, and retention by, the mortgagee, the testimony rather leads to the belief that the transfer was intentionally secret, and not intended to be notorious. There is no testimony tending to show that the Keene Leather Company ever asserted any rights under its mortgage, or did anything to vest the title in itself. On the date of its mortgage, then, to the bank, the Keene Leather Company had no title which it could convey. The title remained in Shaw. The only rights against Shaw which passed to the bank by the mortgage from the Keene Leather Company were rights by estoppel, which resulted from Shaw's standing by and assenting to the transfer. This is made the most of by the learned counsel for the bank; but, if the conveyance shall be held to be a conveyance by estoppel from Shaw to the bank, this estoppel can relate only to Shaw, and not to his trustee in bankruptcy. In spite of anything done by way of delivery to, and retention by, the mortgagee, I am of the opinion, as I have already indicated, that an attaching creditor of Shaw could have prevailed in an attachment of the bark, and, therefore, that there passed to this trustee property which might have been levied upon and sold under judicial process against the bankrupt. I think the case at bar presents an instance of a fraud on the policy and objects of the bankrupt law as clear as that contained in Blennerhasset v. Sherman, 105 U. S. 100, 26 L. Ed. 1080, which latter case is cited by the referee in his report.

In Rogers v. Page, 140 Fed. 596, Judge Lurton, speaking for the United States Circuit Court of Appeals in the Sixth Circuit, said:

"The fact that this was a secret lien gave this property the appearance of being unincumbered, and was the moving inducement of some of his existing creditors to grant delay by extension and renewal. The debtor actively represented this land as an available asset, which he was in constant expectation of selling, and that the proceeds would pay all his debts and disincumber his other property. These representations operated to quiet his existing creditors, and to obtain from some of them extensions and renewals of new credit, in at least one proven case. * * * The mere fact that a mortgage has by negligence been omitted from registration does not avoid it as between parties. * * * But there is a distinction between a mere negligent failure to record a mortgage or deed and a deliberate agreement to do so, although the mere fact of an agreement to withhold from record is not of itself such evidence of a fraudulent purpose as to constitute fraud in law. It is, however, a circumstance constituting more or less cogent evidence of a want of good faith, according to the particular situation of the parties and the intent as indicated by all of the facts and circumstances of the particular case."

In the case at bar the testimony tends to show that, at the time of the giving of the mortgage to the bank, Shaw was insolvent, that there was an obvious attempt to make the delivery to the mortgagee secret, rather than open, and that there was a distinct and affirmative understanding that the mortgage was not to be recorded. The case discloses a want of good faith, resulting in an actual fraud upon the general creditors.

I think the referee was correct in his conclusion "that a fraud was attempted upon the creditors of Shaw, and that an allowance of the mortgage to the bank would be a consummation of the fraud."

The finding of the referee in his report is confirmed.

The claim of George A. Gorham, trustee, to the proceeds of the 1,844.27 cords of hemlock bark is affirmed.