HANSON v. W. L. BLAKE & CO. et al.

(District Court, D. Maine. August 3, 1907.)

No. 24.

1. BANKRUPTCY—LIENS—EQUITABLE RIGHTS UNDER UNRECORDED MORTGAGE.

Claimant was given a mortgage on a sawmill building and a part, but not all, of the machinery therein, which mortgage was not recorded in the town where the mortgagor resided, as required by the statute of the state in case of chattel mortgages. The mill burned, and the property was partially destroyed, and several months afterward the mortgagor was adjudged a bankrupt, and his trustee took possession of and sold the remnants of the mill property. After the adjudication claimant recorded her mortgage, but in the meantime took no steps to obtain possession of any of such property or to assert any right thereto under the mortgage. Held that, under the facts, she had no equitable claim to the proceeds of such property which could be enforced against the trustee in bankruptcy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 276.]

2. SAME—PROCEEDS OF INSURANCE.

The mortgagor, however, having taken out a policy of insurance on the property payable to the claimant as her interest might appear, in accordance with an agreement made when the debt was created, she had an equitable lien on the proceeds of such policy enforceable as against the trustee in bankruptcy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 295.]

8. SAME—PROPERTY HELD UNDER CONDITIONAL SALE CONTRACTS.

Claimants sold machinery and other supplies to be used in the construction and equipment of a sawmill, taking notes therefor reciting that the title to the property should remain in the sellers until the notes were fully paid. Such notes were not recorded as required by the statute of the state in case of conditional sales. The mill and a part of the machinery were destroyed by fire, and subsequently the purchaser was adjudged a bankrupt, and the remnants, consisting in part of the property sold to the bankrupt by claimants and in part of other property, were sold by the trustee. Held, that the facts were not sufficient to impress the fund arising from such sale with an equitable claim in favor of claimants arising out of the conditional sale notes.

4. SAME—PROCEEDS OF INSURANCE.

Where a bankrupt, on a purchase of property under contracts of conditional sale, orally agreed to insure the same for the benefit of the sellers until it should be fully paid for, and actually procured a policy of insurance thereon payable to them as their interest might appear, which was delivered to them, on a destruction of the property by fire the fund arising from the insurance, was impressed with an equitable lien in favor of the sellers arising out of the agreement and enforceable as against the trustee in bankruptcy, even though the bankrupt had a renewal policy made payable to another than the sellers, of which fact they had no knowledge.

5. SAME—PREFERENCE—ASSIGNMENT OF CLAIM FOR INSURANCE.

The assignment by a bankrupt within four months prior to his bankruptcy and while insolvent of a claim against an insurance company for a fire loss to secure a prior indebtedness was void as a preference, and created no legal or equitable lien in favor of the assignee to the insurance money as against the trustee in bankruptcy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 247.]

6. MORTGAGES—CHARACTER OF INSTRUMENT—MORTGAGE OF BUILDING TO OWN-ER OF LAND.

A mortgage taken by the owner of land on a mill built thereon with his consent, under an oral agreement that on subsequent payment of an agreed price he would convey the title, is not a mortgage of real estate.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Mortgages, § 10.]

7. BANKRUPTCY—AGREEMENT TO INSURE — EQUITABLE LIEN ON INSURANCE MONEY.

An oral agreement by a mortgagor to insure the property for the benefit of the mortgagee whose money was used in its purchase and construction gives the mortgagee an equitable lien upon the proceeds of the insurance after the property has been destroyed by fire, as against the mortgagor or his trustee in bankruptcy, although such agreement was made after the mortgage was given and the policies had been issued which were not in terms for the mortgagee's benefit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 295.]

In Equity.

George M. Hanson, pro se.
Benjamin Thompson and James H. Gray, for W. L. Blake & Co.
Ashley St. Clair, for Mynia A. Young.
Fred V. Pickard, for Arabella Hicks.
Clement B. Donworth and M. M. McKusick, for E. A. Holbrook.

HALE, District Judge. This cause in equity is heard upon bill and answer and proofs. The bill seeks to determine the rights of the trustee in bankruptcy and of several claimants, who are made respondents, in and to certain moneys arising from the sale of the remnants of a sawmill, its machinery, and appliances, and from the adjustment of certain fire insurance after the loss by fire of the bankrupt's mill.

## Statement of the Case.

It appears from the record that the bankrupt, Ira Hicks, was a resident of Calais, Me. In September, 1901, he entered into an oral agreement with respondent, Edward A. Holbrook, and one Charles A. Hunter, respecting the purchase from them of certain real estate situated at Vanceboro, in this district, upon which Hicks then intended to erect a sawmill. Under this agreement, Hicks was to have a mill privilege upon the land of Holbrook and Hunter for the sum of $75. No deed was ever made conveying the property to Hicks. Holbrook testifies that:

"Payment was to be made after he [Hicks] had completed his building, and had run sufficient time so that he could pay for it. The deed was to be given at the completion of payment. The substance was we tried to make it possible for him to pay for it at a time after he had got out of the strain necessary for him in starting, and be able to collect himself and settle. We were not in need of the money and he was."

He thus describes the land:

"A piece of land on the river with a frontage of between 10 and 15 rods extending back to the line of the old New Brunswick Railroad bed; and we took stakes and drove them at the four points of the four corners that would include the lot of land which he should occupy."

Hicks immediately commenced to erect a mill building about 30 by 40 feet in size, and an engine house. In this construction work he

spent about $6,000. The mill began sawing in February, 1902, and continued until August 24, 1903, when it was burned; and the greater part of the mortgaged property was destroyed. Under an order of the court, the remnants have been sold by the trustee for $225, and that amount is now in the trustee's hands. After Hicks had completed his mill, he obtained insurance upon it and upon the machinery in the sum of $2,500. After the loss, the insurance was adjusted for $2,-150. The insurance money arising from the loss has been paid over by the several insurance companies, and that sum is now on deposit under a stipulation assented to by all parties in interest, to await the termination of this suit.

### Statement of Claims.

The record shows the following claims:

First. The claim of Mynia A. Young for cash loaned, secured by a mortgage upon the mill property, and by a policy of the Liverpool & London & Globe Insurance Company, for $1,000, in which Mrs. Young is named as beneficiary. The following facts appear in evidence in reference to this claim: On January 7, 1902, Ira Hicks made and delivered to Mrs. Young a mortgage for $600 on the following property, namely: The sawmill building, occupied by said Hicks, on the shore of the St. Croix river, at Vanceboro, Me., two cylinder stave machines, lathe machine, and shingle machine therein, and all shafting, belting, and other running gear. Hicks declined to give Mrs. Young security on the boiler and engine, for the reason that some other person had a claim upon them. As a part of the consideration for the loan, Hicks agreed to take out insurance for the benefit of Mrs. Young, and Melville L. Young, the husband of the mortgagee, testified that that was the only condition upon which the loan was made.

This mortgage was recorded at Vanceboro on January 8, 1902; and, after Hicks' adjudication in bankruptcy, it was also recorded at Calais, the residence of Hicks. The evidence shows that, pursuant to the agreement made at the time of making the loan, Hicks obtained insurance upon the property; and one policy was payable to Mrs. Young.

It also appears from the testimony of Ashley St. Clair, agent for the Liverpool & London & Globe Insurance Company, that this policy at the time of its renewal was also made payable to Mrs. Young, and that the loss under it was adjusted, after the fire, for the sum of $1,000.

Second. W. L. Blake & Co. also make claim to the remnants in the trustee's hands. They claimed to have an equitable lien upon a portion of the insurance money.

The record shows the following facts respecting this claim: On October 22 and December 14, 1901, Hicks entered into agreements with W. L. Blake & Co. for the purchase of certain machinery, such as boiler, engine, steam pump, smokestack, and other personal property, for the equipment of his mill, of the value of $1,350; and the property in question was delivered by Blake & Co. to Hicks, under two Holmes notes, or conditional contracts, which recited, in substance, that the title to the property was to remain in W. L. Blake & Co. until the notes were fully paid. Hicks agreed to obtain insurance for the benefit

of Blake & Co. to protect them for such time as the indebtedness remained unpaid. Both of these conditional contracts were recorded in the town clerk's office at Vanceboro, the location of the mill; but neither of them was recorded in Calais, the residence of Hicks. The evidence also shows: That on January 7, 1902, Hicks wrote to Blake & Co. that he had placed insurance upon the property to the amount of $1,000 for their benefit, and again on January 20, 1902, he wrote Blake & Co.:

"I insured the mill in your favor costing me $80 which makes you secure for your debt."

That on March 9, 1902, he wrote Blake & Co.:

"I have got the mill insured for $1,000 to protect you from loss, which cost me $80."

That on January 4, 1902, Hicks obtained from Hanson & St. Clair, agents for the Hamburg-Bremen Insurance Company, a policy of insurance in that company which covered the following property:

"Frame steam sawmill building and additions, metal roof, full arch front stationary boiler, 72 in. in diameter and 16 ft. long and all fixtures attached. One plain slide valve crank engine, 14 in. cylinder, 36 in. stroke, 3½ in. new stop motion governor, all oil cups, governor belt, and fixtures with guy wires. Shafting as follows: One main shaft $3^7/_{16}$ in. in diameter and 30 ft. long; one 24 in. by 10 in.; one 24 in. by 9 in.; all pipes, fittings, valves, whistle, tube scraper, and other shafting and belting as attached to the mill.

"One No. 3 Deane Steam pump and fixtures.

"Payable to W. L. Blake & Company."

This policy was sent by Hanson & St. Clair, the agents of the insurance company, to Blake & Co. It remained in the possession of Blake & Co. until July, 1902, when the Hamburg-Bremen Insurance Company withdrew its agency from Hanson & St. Clair. Thereupon Hanson & St. Clair, as agents of that company, wrote to Blake & Co.:

"We have been directed by Hamburg-Bremen Ins. Co. to cancel Hicks risk at Vanceboro. To protect you we have issued policy in L. & L. & G. for same amount, etc. Kindly return to us the policy of the Hamburg that you now hold."

On July 28, 1902, Hanson & St. Clair substituted for the policy in the Hamburg-Bremen Company a policy in the Liverpool & London & Globe Insurance Company for one year, which covered the identical property mentioned in the Hamburg-Bremen in the same sum, and which was also payable to W. L. Blake & Co. as interest might appear. This policy was also forwarded to Blake & Co. On August 9, 1902, Hanson & St. Clair wrote to Blake & Co.:

"I inclose policy on Hicks mill. Kindly return policy you hold in Hamburg-Bremen."

On April 13, 1903, Hicks again wrote Blake & Co.:

"You are well secured by insurance which cost $100, so that you might be safe."

On June 29, 1903, Blake & Co. wrote Hanson & St. Clair:

"We notice, on looking up the Ira Hicks matter, that the insurance expires July 28th. Will you kindly advise us if he has made arrangements to have this renewed."

On June 30, 1903, Blake & Co. wrote Hicks:

"Kindly not overlok the fact that your insurance runs out July 28th. We suppose you have made arrangements with Hanson & St. Clair to renew this."

On July 2, 1903, Hanson & St. Clair wrote Blake & Co.:

"Replying to your favor of June 30, we have to say that Mr. Hicks has instructed us to renew all insurance as it expires."

On July 28, 1903, Hanson & St. Clair renewed the policy in the Liverpool & London & Globe Insurance Company for the same amount, covering the same property. This policy did not contain the names of W. L. Blake & Co. as beneficiaries, but contained the words:

"Payable in case of loss to Arabella Hicks as interest may appear."

The agent testified that the name of Blake & Co. was left out because Hicks came into the office a few days before the policy run out, and told him that he did not want the policy payable to Blake & Co., as he should have them all paid up within a few months, and that this conversation occurred after his firm had written Blake & Co. that Hicks had requested all policies renewed. Hicks states that, when this policy run out, he changed it to his wife's name, as she had more money in the concern than Blake & Co. No notice of this change was sent to Blake & Co.; and Mr. St. Clair also testified that Mrs. Hicks was not present at the time the policy was renewed. The testimony further shows that Blake & Co. did not have any knowledge that the renewal policy issued on the 28th day of July, by the Liverpool & London & Globe Insurance Company, was not issued as agreed, namely, making them beneficiaries, until the receipt of a letter from Hanson & St. Clair, dated August 24, 1903, as follows:

"The Hicks mill at Vanceboro burned Sunday morning. Looking at the policy register, I see his wife's name is substituted for yours. As she has no mortgage interest this will not affect your lien, but you should give the statute notice. As we understand the arrangement between you and Mr. Hicks, your claim was regarded as a mortgage. Kindly send amount of claim and bill of sale, and we will see that notice is given."

The loss under this policy in the Liverpool & London & Globe was adjusted at the sum of $650.

Third. Arabella Hicks, the wife of Ira Hicks, claimed the insurance received from the Liverpool & London & Globe Insurance Company, which was originally made payable to Blake & Co., and also the insurance received from the Capital Insurance Company. The evidence shows that in November, 1901, she loaned her husband $1,000, and on February 15, 1902, she made a further loan of $500, for which she took his notes, payable two years after date, and the moneys so received by Hicks were used in his business. There is no evidence that there was ever any agreement to insure for her benefit, or that she should have any security for either of the loans so made by her. Mrs. Hicks, however, testified that the insurance policy in the Liverpool & London & Globe was changed to her name to secure her against loss, and that the assignment made on August 25, 1903, of the claim against the Capital Fire Insurance Company, due and owing Hicks

by reason of the loss which occurred on the 23d day of that month, was made to protect her for the moneys which she had let her husband have, and he thought she ought to be secured, and that her husband told her about it, and that she saw and read the policy over. The bankrupt himself testified that, when the policy in the Liverpool & London & Globe expired, he had it changed to his wife's name, because she had more money in his business than Blake & Co. did, that his wife had no mortgage or security on the mill property, and Mr. St. Clair, the agent of the insurance companies, stated that Hicks wanted the policies made payable to his wife, and that this talk occurred after he (St. Clair) had written Blake & Co. that Hicks had requested the policies to be renewed. It also appears that none of the parties to whom the policies were made payable were present when the renewals were issued.

Fourth. Edward A. Holbrook also made claim to the proceeds in the hands of the trustee, and sought to enforce an equitable lien upon all of the insurance money by virtue of the statutes of Maine giving a mortgagee of real estate a lien upon insurance placed thereon by the mortgagor, and further claimed that he was entitled to an equitable lien on the insurance moneys by reason of a promise to insure for his benefit upon the part of Hicks. The evidence shows that on February 25, 1902, Hicks gave Holbrook two notes for $250 in consideration of advances; that on the 21st day of March, 1902, Hicks was indebted to Holbrook for more than $2,000, and that, on that date, he gave Holbrook six notes of $250 each; that on the same day, namely, March 21, 1902, Hicks made and delivered a mortgage to Holbrook to secure the payment of the eight notes. The property described in the mortgage is as follows:

"The mill building and all machinery thereto connected, comprising a steam mill plant with its complement of shafting, two stave machines complete, one shingle machine complete, the boiler and engine, together with any and all machinery belting and outfit for operating, now in said mill, all situated in said Vanceboro, on lot of land bargained for of the said E. A. Holbrook and Chas. A. Hunter, lying west side of St. Croix river, north of Maine Central Ry, and east of old line of New Brunswick Ry."

The condition of the mortgage was that Hicks should pay Holbrook $2,000 in several notes maturing at various times, the last of them at seven months, with interest at the rate of 6 per cent. per annum, payable annually. The mortgage was recorded in the town clerk's office at Vanceboro on March 21, 1902, and in the registry of deeds for Washington county on March 24, 1902. After the adjudication of Hicks as a bankrupt, it was recorded in the city clerk's office in Calais on January 30, 1904. The only interest which Hicks had in any of the real estate was that which has already been alluded to in my statement of the case, namely, the oral agreement to purchase, but without any deed or writings conveying the property. Mr. Holbrook testified that he had no knowledge or intimation that there was any incumbrance on any of the property put into the mill. The evidence does not show that anything was said at the time of giving the mortgage to Holbrook respecting any insurance to secure him. But Mr. Holbrook testified that he told Hicks, after the giving of the mortgage, that:

"We wanted him to protect us by the assignment of·the policy. He· was going to have it done. * * * Some months later he said he had not done so, but would."

Holbrook testified that he never had in his possession any policy of insurance on the property.

·In respect to other insurance, the testimony is that in addition to the policies of insurance already mentioned, on May 1, 1903, the bankrupt obtained a policy in the Capital Insurance Company insuring him for a term of one year from the 1st of May, 1903, to the 1st of May, 1904, as follows:

"$150.00 on his frame steam sawmill building and additions with metal roof. $250.00 on his two cylinder stave machines, including saws, shafting, belting, gearing pulleys and connections. $50.00 on his lath machine contained therein, including saws, shafting, belting, gearing, pulleys and connections. All the above property is situated at Vanceboro, Maine, on the bank of the St. Croix River sixty rods north of the railroad bridge and is occupied by the assured for sawing green lumber into staves, laths and· shingles. Other insurance permitted. Lightning clause attached. $50.00 on shingle machine contained therein."

This policy was not made payable to anybody, and had no connection with the others, but it covered part of the same property covered by the policy originally payable to Blake & Co., the loss under this policy was adjusted for the sum of $500, and that this is the insurance covered by the assignment from Ira Hicks to Arabella Hicks, dated August 25, 1903.

1. In considering the claim of Mynia A. Young, it is necessary to pass upon her rights under the mortgage to the fund derived from the sale of the remnants of the mortgaged property, and to consider also her rights under the insurance policy.

(a) Has she a claim under her mortgage?

It appears by the testimony that the mortgage was made January 7, 1902, and was recorded at Vanceboro January 8, 1902; that the bankrupt at the date of the giving of the mortgages, and at all times thereafter, was a resident of Calais; that, after the adjudication in bankruptcy, it was also recorded in Calais on February 18, 1904; that the petition of the bankrupt was filed December 2, 1903, and he was adjudged a bankrupt December 5, 1903. Section 1 of chapter 93 of the Revised Statutes of Maine provides:

"No mortgage of personal property is valid against any other person than the parties thereto, unless possession of such property is delivered to, and retained by, the mortgagee, or ·the mortgage is recorded by the clerk of the city, town or plantation organized for any purpose, in which the mortgagor resides when the mortgage is given."

Section 67a of the bankrupt act of July 1, 1898 (30 Stat. 564, c. 541 [U. S. Comp. St. 1901, p. 3449]), provides:

"Claims which for want of record or for other reasons would not have been valid liens as against the claims of the creditors of the bankrupt shall not be liens against his estate." ·

Section 70a of the bankrupt act provides:

"The trustee of the estate of a bankrupt, upon his appointment and qualification, and his successor or successors, if he shall have one or more, upon his or their appointment and qualification, shall in turn be vested by operation

of law with the title of the bankrupt, as of the date he was adjudged, except in so far as it is to property which is exempt, to all * * * (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him."

Under the facts disclosed in the record, can the claim of Mrs. Young be enforced in equity, in a bankruptcy court, upon the fund derived from the sale of the mortgaged property?

Her mortgage was not recorded in the town in which the mortgagor resided when the mortgage was given. It was recorded at Calais, but not until after the adjudication in bankruptcy. It is clear that her rights are determined by the date of the filing of the petition in bankruptcy. The language of section 70a of the bankrupt act, which I have quoted, makes this clear. The decisions of the federal courts also make it clear that the rights of creditors to insolvent estates, administered in equity, relate to the time of institution of proceedings in bankruptcy. The mortgage, not having been recorded before the filing of the petition in bankruptcy, may be treated as an unrecorded mortgage. It will be noted that the bankrupt act of 1898 defines the rights in property which pass to a trustee in different language from that employed by the law of 1867 in defining rights which pass under that act to an assignee in bankruptcy. So that the long line of decisions under the act of 1867 do not apply.

The case of Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956, is often cited in the federal courts as deciding that the state law controls in this matter. In that case the court held that:

"Whether the taking possession of after-acquired property within four months of the filing of the petition in bankruptcy, under a mortgage made in good faith prior to that period, is good or is void as against the trustee in bankruptcy, depends upon whether it is good or void according to the law of the state. Held, that such a taking is under the circumstances of this case good according to the law of Massachusetts as construed by its Supreme Judicial Court."

In speaking for the court, Mr. Justice Holmes said:

"The question, then, is one of Massachusetts law, and unfortunately the decision does not leave us free from doubt, upon that point. If hereafter the Supreme Court of the state should adopt a different view from that to which we have been driven, this case would cease to be a precedent. The language of the Massachusetts statute is: 'Unless the property mortgaged has been delivered to and retained by the mortgagee, the mortgage shall not be valid against a person other than the parties thereto until it has been so recorded; and a record made subsequently to the time limited (fifteen days) shall be void.' Mass. Rev. Laws, c. 198, § 1. There are cases which indicate that an assignee in bankruptcy is a universal successor, like an executor or a husband, and so that, as it is put in Lowell, Bankruptcy, § 309, the assignee is the bankrupt. * * * But it is the settled law of Massachusetts that such a fictitious identity does not satisfy the statute that the trustee in bankruptcy is 'a person other than the parties thereto,' and that, therefore, as against him, the mortgage is void. Bingham v. Jordan, 1 Allen (Mass.) 373, 79 Am. Dec. 748; Blanchard v. Cooke, 144 Mass. 207, 226, 11 N. E. 83; Haskell v. Merrill, 179 Mass. 120, 124, 125, 60 N. E. 485. Haskell v. Merrill is cited and relied on in the Supreme Court of the state, and we assume that it and the other cases cited still correctly state the law. It is clear under these cases that recording or taking possession after the qualification of the trustee would be too late, and it certainly would seem not illogical to hold that as against him the mortgage was to be treated as nonexistent at any earlier date

·until the things were done which made it good under the act. In this case the court speaks of 'the proceedings by which the mortgagee obtained his lien, three weeks before the filing of the petition,' which at least suggests, if it does not adopt, the idea that the mortgage then first came into being as against the trustee."

· But in some late decisions in this circuit the Court of Appeals does not treat Humphrey v. Tatman as decisive of the question that the state law is controlling; but tends to the doctrine that in equity this question is a federal question, and that equitable rights of claimants and of the trustee should be settled under the federal decisions, and without reference to local statutes and decisions. Upon an examination of Humphrey v. Tatman, supra, it will be found that it relates to the title to chattels which were added to a stock of merchandise after it was mortgaged. It raises the issue whether a mortgagee gets any title to subsequently acquired property; but some of the language which I have quoted from that opinion relates to the question of how far creditors can seize that which is not the property of the bankrupt. The case turned on the question of the mortgagees having taken possession of the property. If the mortgagee had not taken possession, ·and the question had arisen whether the mortgagee could then hold the after-acquired property in question, as against the trustee in bankruptcy, the rule might have been stated differently. In any event, the Court of Appeals in this circuit tends to hold the question as one having nothing to do with local statutes, but as presenting an equitable question, which should be settled without reference to the statutes of the state where the question arises. In the late case of Alice H. Loveland, Petitioner, in the Matter of Warren H. Littlefield, Bankrupt, and Alfred W. Putnam, Trustee, Appellant, v. Alice H. Loveland, Petitioner (wherein the opinion is as yet unpublished), the Court of Appeals sustained a claim in equity under an unrecorded mortgage of real estate, and held that the mortgagee had a lien superior to the rights of the trustee in bankruptcy. In speaking for the court, Judge Lowell said:

"The general principles of equity, as recognized in the federal courts, give effect to the intention of parties who intend to create a lien under the circumstances of this case, notwithstanding that their agreement by reason of its informality is invalid at law. In York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, the Supreme Court had to deal with an unrecorded conveyance in a state whose statutes required a record, and the title of the transferee was held to be superior to that of the trustee in bankruptcy. The statute there in question, as construed by the state court, made an unrecorded mortgage void as against certain classes of creditors, while leaving it valid as against other classes. The state statute before us makes the unrecorded conveyance void as against creditors without notice, leaving it valid as against those creditors who have notice of it."

See, also, James v. Gray, 131 Fed. 401, 65 C. C. A. 385, 1 L. R. A. (N. S.) 321; Tucker v. Curtin, 148 Fed. 929, 78 C. C. A. 557; Hewit v. Berlin Machine Works, 194 U. S. 296, 302, 24 Sup. Ct. 690, 48 L. Ed. 986.

I have referred to the above cases as showing the current of late decisions of the federal court in this circuit, touching matters relating to rights under unrecorded mortgages, conditional sales, and stat-utes of fraud.

In Atchison Railway Co. v. Hurley, 153 Fed. 503, in an opinion just sent down by the Circuit Court of Appeals for the Eighth Circuit, that court enforces an equitable lien upon very broad equitable principles, holding that the administration and distribution of the property of bankrupts is a proceeding in equity, and should be conducted on broad equitable lines, with a view to recognizing and enforcing the rights of all parties claiming an interest in the estate, whether they be legal or equitable or both. The court recites the line of authorities to which I have already referred, and says:

"Whatever rights the third party had against the property of the bankrupt before the adjudication that party, in the absence of fraud or fixed liens created by state statutes in favor of others, has against his estate in bankruptcy."

Previous to these late decisions the federal courts have often held that the state law in reference to unrecorded mortgages was conclusive in construing the bankrupt act relating to this subject; and in the Loveland Case, supra, Judge Lowell remarks:

"Where the trustee in bankruptcy and the transferee of the bankrupt both claim certain property which once belonged to the bankrupt, it may be difficult to decide how far the title to the property in question depends upon the state law which determines the effect of the bankrupt's conveyance, and how far upon the bankrupt act which declares what property the trustee shall take. The one law regulates the passage of title from the bankrupt and is interpreted by the state court. The other law regulates its passage to the trustee and is interpreted by the federal court."

The only case that has arisen in this district touching the question of an unrecorded mortgage was In re Shaw (D. C.) 146 Fed. 273. In that case—

"a bankrupt who operated a tannery in Maine, some two years prior to the bankruptcy, executed a chattel mortgage to a creditor on all the stock and materials at his tannery, and such as should thereafter be acquired. By agreement the mortgage was not recorded, nor was any possession ever taken thereunder. Subsequently the mortgagee made a mortgage to secure an indebtedness to a bank on certain bark at the bankrupt's tannery, to which it had no title unless by virtue of its own mortgage. Also, by agreement, this mortgage was not recorded, but an attempted delivery of possession was made by going to the tannery, scaling the bark, and placing on each pile a small board, having thereon a letter of the alphabet, and then formally delivering each pile to the agent of the bank who appointed the bankrupt its custodian. There was no visible change of possession, and the bankrupt's trustee took possession of and sold the bark as assets of the estate."

And this court held:

"That under Rev. St. Me. c. 93, § 1, which provides that 'no mortgage of personal property is valid against any other person than the parties thereto unless possession of such property is delivered to and retained by the mortgagee or the mortgage is recorded,' there was no such delivery and retention of possession as to validate either mortgage, but that both were fraudulent as attempted secret liens, and void as against the bankrupt's estate."

And the court said:

"The testimony tends to show that, at the time of the giving of the mortgage to the bank, Shaw was insolvent, that there was an obvious attempt to make the delivery to the mortgagee secret, rather than open, and that there was a distinct and affirmative understanding that the mortgage was not to be recorded. The case discloses a want of good faith, resulting in an actual fraud upon the general creditors."

It will thus be seen that the court placed weight upon the fact that there was an express agreement not to record the mortgage, and that this agreement was a circumstance tending to show actual fraud. In such a case, even under the recent decisions, the court must hold that the lack of record of a mortgage is a circumstance showing fraud. So that, whatever may be the condition of the law, the Shaw Case was decided in accordance with the principles of equity; and so it is in line with the cases to which I have referred. The cases cited in the Shaw Case show the current of decisions up to that time. The case to which I shall refer later in this opinion, In re Garcewich, 115 Fed. 87, 53 C. C. A. 510, is in line with the Shaw Case, and refers to a secret lien.

Later in this opinion I shall discuss other cases bearing upon unrecorded Holmes notes and notes relating to conditional sales. In those citations I shall refer to some federal decisions previous to the late decisions in this circuit.

The question, however, relating to the claim of Mrs. Young to the fund derived from the sale of the mortgaged property does not necessarily depend upon the record of the mortgage; for, in any event, sufficient facts are not disclosed to sustain the equitable lien of the claimant upon the fund. The fund in question arises from the sale of the remnants of the whole of the mortgaged property. The mortgage of Mrs. Young was upon a portion only of the property. Further than that no possession was taken by the mortgagee; and no efforts were made by her to enforce her equitable rights. Under the facts disclosed by the record, her claim cannot be enforced to the fund of $225 derived from the sale of the remnants of the mortgaged property.

(b) What are the equitable rights of the claimant, Mrs. Young, in and to the fund arising from the adjustment of the fire insurance?

The record shows that at the time the loan was made there was an agreement that it was to be secured by an insurance policy, and that the only condition upon which the loan was obtained was the consideration that the property should be insured for the benefit of Mrs. Young. In pursuanec of that agreement, the bankrupt had the property insured. One of the policies, for $1,000, upon its renewal, January 4, 1902, was made payable to Mynia A. Young. She was the beneficiary as her interest might appear. Does the testimony give her an equitable lien?

It will be noted that we are not now discussing "property" within the meaning of the bankrupt act; but merely a contract to indemnify the insured in the event of a loss by fire. It is evident that a fire insurance policy is not an asset to which the purchaser could look for security until the occurrence of the loss by fire.

Did, then, an equitable lien exist, in consequence of the agreement, upon the policy and the money received therefrom?

In Wheeler v. Insurance Company, 101 U. S. 439, 25 L. Ed. 1055, it was held that:

"Where by his covenant or otherwise a mortgagor is bound to insure the mortgaged premises for the better security of the mortgagees, the latter have, to the extent of their interest in the property destroyed, an equitable lien upon the money due on a policy taken out by him."

In speaking for the Supreme Court, Mr. Justice Bradley said:

"It is settled by many decisions in this country that, if the mortgagor is bound by covenant or otherwise to insure the mortgaged premises for the better security of the mortgagee, the latter will have an equitable lien upon the money due on a policy taken out by the mortgagor to the extent of the mortgagee's interest in the property destroyed. * * * And this equity exists, although the contract provides that in case of the mortgagor's failing to procure and assign such insurance the mortgagee may procure it at the mortgagor's expense."

It will be observed that in the claim now before the court the mortgagee is made the beneficiary in the policy, so that she has a stronger claim than arose in the case which I have just cited. She has substantially the same claim in equity that she would have had if the insurance policy had been taken out in the name of the bankrupt, and had then been assigned to her.

See, also, Richardson v. White, 167 Mass. 58, 44 N. E. 1072; Stearns v. Quincy Ins. Co., 124 Mass. 61, 26 Am. Rep. 647, and cases cited.

The federal courts have held, in a consistent line of decisons, that in circumstances like those in the case at bar the recording of an equitable lien is not necessary.

In Re Little River Lumber Co., (D. C.) 92 Fed. 585, the court said:

"The transfer of these policies was not required by any law to be recorded or registered in order to give notice. * * * Prior to the fire these policies were not assets, like notes, mortgages, and other choses in action, to which creditors could look for security. Indeed, the company could not collect them. There had been no loss, and their collection depended on the loss. * * * Is the equitable assignment thus made of the proceeds of a policy thus pledged more than four months before bankruptcy, in violation of the bankrupt act? If so, of what provision? * *. * In the first place, these insurance policies were not property within the meaning of the bankrupt law. They were mere contracts to indemnify the assured in the event there was a loss by fire. They were not an asset to which creditors could look for any security until a loss had occurred. * * * They were, however, assignable in equity, and, before the loss, had been hypothecated to O'Dwyer & Ahern as collateral. But, if the policies were property, in order to contravene the section referred to they must have been transferred 'with intent to prefer such creditors over his other creditors.' * * * When the original pledge was made, the evidence shows the company was solvent. It was insolvent when most of the policies were renewed, and most of them were renewed more than four months prior to the bankruptcy of the company."

In the claim now before me the facts stated in the record show that, as a condition for making the loan, there was an agreement to insure for the benefit of the claimant, and that the policy and the renewal of it were taken in her name as her interest might appear. Her insurable interest appears by the facts found in the statement of the case which I have made. Her equitable interest appears as I have just pointed out.

I find, then, that an equitable lien existed upon the policy for $1,000 to secure the claim of Mynia A. Young to the extent of that claim, namely, the sum of $600, with interest from January 7, 1903, making her whole claim $763.20.

2. The claim of W. L. Blake & Co. is also to be considered in two parts.

155 F.—23

(a) Have they an equitable lien upon the fund of $225 derived from the sale of the remnants of the property?

The case shows that in October and December, 1901, the bankrupt made certain contracts with Blake & Co. for the purchase of machinery described in the contracts. He gave Holmes notes, reciting severally that they were given for the property described, and that the title was to remain the property of Blake & Co. until the several notes were fully paid. These notes were recorded in the office of the town clerk of Vanceboro; but were never recorded in the town of Calais, where Hicks lived. Section 5 of chapter 113 of the Revised Statutes of Maine provides:

"No agreement that personal property bargained and delivered to another, shall remain the property of the seller till paid for, is valid unless the same is in writing and signed by the person to be bound thereby. And when so made and signed, whether said agreement is, or is called a note, lease, conditional sale, purchase on instalments, or by any other name, and in whatever form it may be, it shall not be valid, except as between the original parties thereto, unless it is recorded in the office of the clerk of the town in which the purchaser resides at the time of the purchase."

I have already quoted the provisions (sections 67a and 70a) of the bankrupt act. In deciding whether the claimant can enforce an equitable lien upon the fund derived from the sale of the remnants of the mill, it becomes material to inquire whether the property covered by the Holmes notes and the property sold are the same. I find that each note was for a different property. The first was for a boiler, engine, steam pump, smokestack, shafting. The second was for corrugated roofing, piping, and similar supplies. The property from which the fund is derived was the remnant after the destruction of the mill and contents by fire. The chattels covered by the Holmes notes are, then, but a part of the property, the remnant of which has been sold and has become the basis of the fund in question. There being different claimants making claims upon this fund, and there being no identity of property, it is impossible to impress the whole fund with the equities arising from these two Holmes notes. Inasmuch as the case, however, may go beyond this court, it is not wise to dismiss the case by passing upon this mere question of fact, but it is wise to consider what effect the nonrecording of the Holmes notes has upon this subject-matter. Much that I have said relating to the first claim applies to the claim which I am now considering. Notwithstanding the apparently sweeping phraseology of sections 67a and 70a of the bankrupt act, I have already observed that the courts in this circuit have lately shown at least a tendency to hold that these sections of the bankrupt act are not applicable to conditional sales, even though expressly declared by state statutes to be void for lack of record, and that the whole subject is to be treated with reference to the federal decisions and without reference to local statutes or local decisions of the states. Loveland. Case, supra; James v. Gray, supra; Tucker v. Curtin, supra; Hewit v. Berlin Machine Works, supra.

A similar question was before Judge Webb in this district in 1899, in the proceedings of George D. Robinson, individually and as a member of the firm of Robinson & Hodgdon. In that case the Abram French Company proceeded against Wilford G. Chapman, as trustee

in bankruptcy of Robinson & Hodgdon, to recover personal property which the company had delivered to the bankrupts. In an unpublished opinion, Judge Webb said:

"The Abram French Company did not sell the articles so specified, but contracted to lease them to Robinson & Hodgdon, upon terms agreed to, by which the lessees would finally become vested with the title to the property upon performing all the conditions agreed to be contained in the lease. * * * The Abram French Company never parted with the title and property in the articles in controversy. Without considering what might have been the rights of attaching creditors of Robinson & Hodgdon or bona fide purchasers for value, since no such question is presented in the case, I hold that the special agreement was valid as between the French Company and Robinson & Hodgdon, that they might at any time have taken possession of the articles, that the title of the trustee is no greater than that of the copartnership and the partners."

He refers to Donaldson v. Farwell, 93 U. S. 631, 23 L. Ed. 993, Stewart v. Platt, 101 U. S. 731, 25 L. Ed. 816, Dudley v. Easton, 104 U. S. 99, 26 L. Ed. 668, and also adopts the language of the court in Yeatman v. Savings Institution, 95 U. S. 764, 766 (24 L. Ed. 589), in which it was held:

"The established rule is that except in cases of attachments against the property of the bankrupt within a prescribed time preceding the commencement of proceedings in bankruptcy, and except in cases where the disposition of property by the bankrupt is declared by law to be fraudulent and void, the assignee takes the title subject to all equities, liens, or incumbrances, whether created by operation of law or by act of the bankrupt, which existed against the property in the hands of the bankrupt. He takes the property in the same 'plight and condition' that the bankrupt held it."

Judge Webb then proceeds:

"There was delay on the part of Robinson & Hodgdon in executing this lease, among other reasons, because Hodgdon made objection to engaging in a copartnership. Correspondence followed, in which the Abram French Company called attention to the failure to sign and return the lease, and were informed that the draft which was sent had in some way become lost. By the lease a payment of $300 was to be made in cash at once, but it was never made. One hundred and twenty-five dollars was sent with suggestion of other changes in the terms of the lease, especially as to its times and amount of payments. These changes were never assented to by the French Company, who constantly insisted upon a performance by Robinson & Hodgdon of the contract of lease."

In that case it appears that there was no completed contract which could have been recorded; and therefore it could not have been within the provisions of section 5, c. 113, Rev. St. Me. The case is discussed precisely as if the bankruptcy law of 1898 had been the same as the bankruptcy law of 1867, and did not contain the provisions 67a and 70a. But, as I have said, in that case there was nothing to be recorded. There was no agreement calling for any record. While the goods had been forwarded to Portland, the terms under which they had been retained had not been definitely fixed and reduced to writing. And in that case Judge Webb did not discuss the principles laid down in the late cases in this circuit to which I have referred. In another branch of the case at bar I have already commented upon Humphrey v. Tatman, supra, and other cases in which the federal courts have followed the decisions of the state courts, relating to the effect of

unrecorded conditional sales. In the Garcewich Case, supra, Judge Wallace shows the general attitude of the federal courts upon this subject, and especially upon fraudulent conditional sales. He says:

"It is the settled law of this state that personal property may be sold and delivered under an agreement for the payment of the price at a future day, and the title by express agreement remain in the vendor until the payment of the purchase price. In such a case the payment is strictly a condition precedent, and until the performance the title does not vest in the buyer. It is one of the exceptional cases in which the law tolerates the separation of the apparent from the real ownership of chattels when the honesty of the transaction is made to appear; but, when the purpose for which the possession of the property is delivered is inconsistent with the continued ownership of the vendor, the transaction will be presumed fraudulent as against purchasers and creditors. The transaction will be deemed merely colorable, and the title to have been vested absolutely in the buyer. Ludden v. Hazen, 31 Barb. (N. Y.) 650; Frank v. Batten, 49 Hun, 91, 1 N. Y. Supp. 705; Bonesteel v. Flack, 41 Barb. (N. Y.) 435. When the property is delivered to the vendee for consumption or sale, or to be dealt with in any way inconsistent with the ownership of the seller, or so as to destroy his lien or right of property, the transaction cannot be upheld as a conditional sale, and is a fraud upon the creditors of the vendee. Even in the case of a chattel mortgage, when it is understood between the mortgagor and the mortgagee that the mortgagor may sell the chattels in his business, and use the proceeds, the transaction is fraudulent in law as against the creditors of the mortgagor. Such an arrangement, if expressed in the instrument, defeats its essential nature and qualities as a mortgage, so that, in a legal sense, it is not a security, but merely the expression of a confidence by the mortgagee in the montgagor, and, if made, but not expressed in the instrument, is equally vicious, if not more suggestive of a fraudulent purpose."

Dealing with this subject, the following decisions of the federal courts are important, although many of them have taken a different view of the law relating to unrecorded mortgages and conditional sales from that taken by the leading cases in this circuit: Re Chesapeake Shoe Co. v. Seldner, 122 Fed. 593, 58 C. C. A. 261; Re Josephson (D. C.) 116 Fed. 404; Re Tatem & Ano. (D. C.) 110 Fed. 519; Re Shirley, 112 Fed. 301, 50 C. C. A. 252; Re Pekin Plow Co., 112 Fed. 308, 50 C. C. A. 257; Re Builders' Lumber Co. (D. C.) 148 Fed. 244; Re Foundry & Machine Co., 17 Am. Bankr. Rep. (August, 1906) 291, 147 Fed. 828; Re Bradley, Alderson & Co., 17 Am. Bankr. Rep. 495, 149 Fed. 254; Re Smith & Schuck, 13 Am. Bankr. Rep. 103, 132 Fed. 301; Re Nathan Lukens, 14 Am. Bankr. Rep. 683, 138 Fed. 188; Fisher v. Cushman, 103 Fed. 860, 43 C. C. A. 381, 51 L. R. A. 292.

I have referred to these cases, and especially to the recent cases in this circuit, in order to show the present condition of the federal law relating to this subject. I do not base my decision, on this branch of the case, upon the fact of the lack of record of the Holmes notes, but I come to my conclusion, because the facts shown in the record are not sufficient to impress the fund with the equitable claims arising under these conditional sales.

(b) What are the equitable rights of these claimants under their insurance policies?

Upon this point, the record shows an agreement between the bankrupt and Blake & Co. that the bankrupt should insure the property received from Blake & Co.; that the bankrupt took out a policy in the

Liverpool & London & Globe Insurance Company payable to Blake & Co. in accordance with the agreement. This agreement relating to insurance was an oral agreement. Neither the conditional contracts, nor any of the mortgages in the case, contain any agreement relating to insurance. The record further shows that Hicks carried out his agreement to insure. The letters contained in the record show that he did as he agreed, and that the policy was, in fact, taken out and delivered to Blake & Co. in the Hamburg-Bremen Insurance Company, and later in the Liverpool & London & Globe. The claim of Blake & Co. differs from that of Mrs. Young, however, in this: that in her case she was named as beneficiary in the policy. Blake & Co. were not named as beneficiaries in policies which existed at the time of the fire; but, on the other hand, notwithstanding the policy in the Liverpool & London & Globe was originally payable to Blake & Co., at the time of its renewal the bankrupt requested the agent of the company to make it payable to his wife, instead of to Blake & Co., and it was so made in consequence of this request. Blake & Co. knew nothing of this change until after the loss by fire. In consequence of the agreement to insure which the case shows, did an equitable lien exist upon the insurance policies and upon the moneys which have been received from them?

I have already cited and considered Wheeler v. Insurance Company, supra.

In Farmers' Loan & Trust Co. v. Penn Plate-Glass Co. et al., 103 Fed. 132, 43 C. C. A. 114, 56 L. R. A. 710, it was held that:

"The rule that, where a mortgagor has covenanted to insure the mortgaged property for the benefit of the mortgagee, a court of equity may impress an equitable lien in favor of the mortgagee upon a fund arising from insurance taken by the mortgagor in his own name, is based upon the existence of an express contract by which the owner agreed to give a lien upon that particular fund, and upon the maxim that equity regards as done that which ought to be done; but, as equity cannot create the lien independently of contract, such rule cannot be applied to the proceeds of insurance taken for his own benefit by a grantee of the equity of redemption in the property subject to the mortgage, between whom and the mortgagee there is no contract with respect to such fund."

In that case, in speaking for the Circuit Court of Appeals for the Third Circuit, Judge Gray quoted the language of the court in Wheeler v. Insurance Company, supra, and said:

"The equitable lien in such case arises from the unperformed contract between mortgagor and mortgagee. Equity regards as done that which ought to be done. And, therefore, if the mortgagor, having so covenanted, fails to make the policy of insurance payable to the mortgagee, or to assign the same, before or after loss, the fund arising therefrom is clearly within the operation of the fundamental maxim just quoted, because the mortgagor was bound to so fulfill his promise to the mortgagee as that funds arising from insurance effected by the mortgagor should belong to the mortgagee, at least to the extent of his (the mortgagee's) interest in the property insured. This promise or executory contract equity will enforce by impressing such funds with a lien in favor of the mortgagee, whether in the hands of the mortgagor, his heirs, executors, or administrators, the insurance company, or voluntary assignees of said funds, or purchasers or incumbrancers thereof with notice. Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865; 3 Pom. Eq. Jur. § 1235. But, apart from cases of fraud, it is only when there is such a contract or promise, which can be so enforced, that courts of equity

will recognize for that purpose the existence of an equitable lien. In such case the lien is impressed upon funds or property, which, belonging to the promisor, were the very funds or property which constituted the subject-matter of the contract, or to which the contract or promise related. It is essential, therefore, that the funds or other property which are to be charged with the lien should have, either at the time of the contract or afterwards and while it was still unperformed, belonged to the party against whom the contract is to be so enforced, and be so identified, even though at the time of suit the said funds or property have come into the hands of volunteers, or of others who may be affected with notice. There must, therefore, exist a contract by the party owning, either in præsenti or in expectancy, the property sought to be charged, which directly or by necessary implication expresses the intention to charge such property with the lien, in favor of the other party, to the contract. These requisites to the establishment of an equitable lien are clearly recognized by the Supreme Court in the late case of Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865. The court in that case quote and adopt the language of the Supreme Judicial Court of Massachusetts in Pinch v. Anthony, 8 Allen (Mass.) 536. * * * Equity will, under some circumstances, enforce the performance of a contract, or of a duty growing out of a contract, through the indirect methods of the recognition of an equitable lien or assignment; but it will not, in the absence of fraud, create the duty or obligation independently of a contract, expressed intent, or will, at some time entered into or declared by the party sought to be charged."

This case was affirmed, on appeal, by the United States Supreme Court in Farmers' Loan & Trust Co. v. Penn Plate-Glass Co., 186 U. S. 434, 22 Sup. Ct. 842, 46 L. Ed. 1234. In speaking for the Supreme Court, Mr. Justice Peckham said:

"The case of Wheeler v. Insurance Company is founded upon the existence of the obligation of the mortgagor to insure, and it is said that, under such circumstances, the mortgagee will have an equitable lien upon the money due upon a policy of insurance taken out by the mortgagor to the extent of the mortgagee's interest in the property destroyed, and that such equitable lien exists, although the contract provided that in case of the mortgagor's failure to procure and assign that insurance the mortgagee might procure it at the mortgagor's expense. If the insurance had been taken out by this mortgagor company, even in its own name, we would have the same principle as decided in the last cited case, and the complainant herein might, as its counsel claim, have had an equitable lien upon the moneys arising from such insurance to the extent of the loss under the mortgage."

In Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453 (41 L. Ed. 865), in speaking for the Supreme Court, Mr. Justice White said:

"The questions which first require solution are: Did the agreement embodied in the letter create an equitable lien, in favor of Walker & Co., upon the bonds of Brown pledged to the Union National Bank? And, if so, were they returned to Brown under such circumstances as to cause the lien, if any existed, to be operative against the bonds in the hands of Mrs. Brown, who holds them under a gift from Brown, and, therefore, subject to such lien, if any, attached to them in the hands of Brown? Before considering the contract itself and the issue of fact which arises, it is necessary to fix the legal principles by which the question of equitable lien is to be determined. It is clear that if the express intention of the parties was to create an equitable lien upon the bonds or the value thereof, or if such intention arises by a necessary implication from the terms of the agreement construed with reference to the situation of the parties at the time of the contract, and by the attendant circumstances, such equitable lien will be enforced by a court of equity against the bonds in the hands of Brown or against third persons who are volunteers or have notice."

In Wilder v. Watts (D. C.) 138 Fed. 426, it was held:

"Where an alleged bankrupt before insolvency arranged to borrow money to purchase goods under an agreement that he would have the goods insured, and assign the policies to the lenders as collateral security, and loans were made to him, the agreement operated as a valid equitable assignment of the policies, although they were not delivered when issued, nor actually assigned until after loss, when the borrower was insolvent."

Judge Brawley said:

"Here the debtor agreed to insure for the protection of his creditor, in order to obtain the money loaned. He could not have obtained the advances otherwise, and the agreement to transfer the policy of insurance was not an asset on the faith of which he received other credit. There was no proof that other creditors sold him goods on the faith of the insurance policy. * * * It was not an asset available for creditors until the fire, and an effective transfer of the policy could not have been made before the fire, because most of the standard forms of policy forbid an assignment before a loss."

Judge Brawley refers to Swearingen v. Insurance Company, 52 S. C. 315, 29 S. E. 723, in which Chief Justice McIver said:

"While a policy of insurance is purely a personal contract between the insurer and the assured, and hence the mortgagee of the premises insured, merely as such, has no interest, either in law or equity, in a policy of insurance taken out by the mortgagor in his own name and for his own benefit, yet if the mortgagor is bound, either by covenant in the mortgage or otherwise—for example, by a valid verbal agreement—to keep the property insured, as a further security for the payment of the mortgage debt, then the mortgagee is entitled to an equitable lien upon the money due on the policy of insurance, even though taken out in the name of the mortgagor."

In Stearns v. Quincy Insurance Co., 124 Mass. 61, 26 Am. Rep. 647, the action was one of contract to recover upon a policy of fire insurance. The court said:

"The plaintiff relies on the rule that where a promise is made by one person to procure insurance upon property, in which another has some interest, for the benefit of the latter, and then the promisor, with the intention of performing his promise, obtains a policy of insurance in his own name, the party intended to be benefited will have an equitable lien on the policy and its proceeds, which he may enforce against the insurer or the promisor, or may maintain against the creditors of the latter. This rule, and the lien thus created, it is said, will be regarded and enforced both at law and in equity. * * * In all the cases found which support the claim of the mortgagee to insurance obtained by the mortgagor in his own name, the facts were such as to justify the conclusion, by estoppel or otherwise, that such insurance was obtained by the latter as the agent of, or with intent to perform the obligation he had assumed to, the former." Richardson v. White, supra; James v. Newton, 142 Mass. 366, 8 N. E. 122, 56 Am. Rep. 692; Exchange Bank v. McLoon, 73 Me. 508, 40 Am. Rep. 388; Providence County Bank v. Benson & Trustees, 24 Pick. (Mass.) 204; In re J. F. Grandy & Son (D. C.) 146 Fed. 318; Long v. Farmers' State Bank, 17 Am. Bankr. Rep. 103, 147 Fed. 360.

I have already called attention to In re Little River Lumber Company, supra, and the line of cases which hold that the record of the equitable lien is not necessary.

On a careful examination of the law and of the evidence shown in the record before me, I have no hesitation in concluding that the case shows a clear and distinct oral agreement on the part of Hicks that he would insure the property received from Blake & Co. until his indebtedness was paid in full; that he confirmed this oral agreement by

three letters; that he did insure a part of the property in question in the Liverpool & London & Globe Insurance Company, and a part in the Capital Insurance Company; that an equitable lien in favor of Blake & Co. existed upon such policies, and is impressed upon the fund arising from them, to secure the payment of the indebtedness due to that company. The renewal policies were merely substitutes for the original policies. The fact that Mrs. Hicks' name was inserted as beneficiary in the Liverpool & London & Globe policy at the time of its renewal cannot affect the equitable rights of Blake & Co. As to the effect of inserting her name in the policy, I refer to Wittenberg Veneer & Panel Co. (D. C.) 108 Fed. 593; Ames v. Richardson, 29 Minn. 330, 13 N. W. 137; McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554; Fairbanks v. Sargent, 104 N. Y. 108, 9 N. E. 870, 6 L. R. A. 475, 58 Am. Rep. 490.

Although these claimants were not inserted as beneficiaries in the final renewals of the policies, equity treats as done what ought to have been done, and what it was clearly the intention of the parties to do. Nordyke & Marmon Co. v. Gery et al., 112 Ind. 535, 13 N. E. 683, 2 Am. St. Rep. 219.

The court finds, then, that an equitable lien is impressed upon the insurance fund to secure the claim of W. L. Blake & Co. to the extent thereof, namely, in the sum of $597.11, due on the 2d day of January, 1904, and interest thereon, making their full claim the sum of $723.70.

3. In respect to the claim of Arabella Hicks, the wife of the bankrupt, the case shows that Hicks assigned to his wife his claim against the Capital Fire Insurance Company. The assignment was originally dated August 28, 1903, and afterwards changed to August 25, 1903. Mrs. Hicks testifies that the assignment of this policy was made to protect her from loss for money which she had loaned her husband, and that her husband thought she ought to be secured. It is unquestioned, however, that this assignment was to secure a prior existing indebtedness. The assignment was made on August 25, 1903. Hicks' petition in bankruptcy was filed in this court December 2, 1903. The assignment was clearly a preference, and was in violation of sections 60a and 60b of the amended bankruptcy act of February 5, 1903 (32 Stat. 799, c. 487 [U. S. Comp. St. Supp. 1905, p. 689]). Mrs. Hicks had no legal claim. She has no equitable lien upon any fund now before the court.

4. The claim of Edward A. Holbrook: The learned counsel for Holbrook contends that his claim to the proceeds of the remnants of the plant and the proceeds of the insurance policy is paramount; that he is a real estate mortgagee to the extent of his claim of $2,000 and interest, and, as such, he was given a statutory lien upon the proceeds of the insurance policy; that, although he made no agreement in writing to convey to Hicks the land on which the mill and plant were erected, yet the oral agreement to that effect, coupled with Hicks' possession, gave Hicks a vested equitable title; that the mortgage from Hicks to Holbrook was a real estate mortgage, and, as such, was properly recorded in the registry of deeds for Washington county; that, although the mortgage did not mention the land, the conveyance

of the buildings carried with it the mortgagor's equitable title to the land.

The learned counsel for this respondent claims, however, that, if Holbrook cannot be held to have a prior claim as a real estate mortgagee, he still has an equitable lien upon the insurance fund.

(a) What are the rights of Holbrook as a real estate mortgagee?

The learned counsel for Holbrook contends that the mortgage from Hicks to Holbrook was intended to be a mortgage of real estate, and that it operated as such a mortgage. He cites the case of Hatch v. Brier, 71 Me. 542, in which the Supreme Judicial Court of Maine held that a deed of the westerly part of a dwelling house and one-half of the cellar conveys the land under the part of the dwelling house conveyed. In this case, in speaking for the court, Mr. Chief Justice Appleton cites Cunningham v. Webb, 69 Me. 93, and says that, in that case, Libby, J., uses this language:

"A grant of a house standing on a lot of land, fenced and used as a house and garden, conveys, not only the house, but the lot of land on which it stands, unless it appears from the deed, or the facts and circumstances existing at the time applicable to the estate, that that was not the intention of the parties."

The Maine cases cited by the learned counsel are in line with Cheshire v. Inhabitants of Schutesbury, 7 Metc. (Mass.) 566, 568, where, in speaking for the court of Massachusetts, Judge Wilde said:

"By the grant of a dwelling house the land under it passes as necessary to its use and enjoyment." Greenwood v. Murdock, 9 Gray (Mass.) 20, 22, 69 Am. Dec. 272.

I will not now discuss the question whether, under certain recent decisions of the federal courts, the above cases have any applicability in a court of bankruptcy. It is enough to say that in any court they cannot be decisive of the question now before me. In those cases the grantor of the building was the owner of the land upon which the building stood; and the court held that, in conveying the building, he conveyed, not only the building, but the land on which it stands, unless it appears from the deed, or from the circumstances, that such was not his intention. But in the case before the court the land in question was owned by Holbrook and his co-tenant. Hicks was under an oral agreement with them respecting the purchase of that land from them, upon which he intended to erect a mill. The paper which is not claimed by Holbrook to be a real estate mortgage was a mortgage upon the building and machinery placed upon Holbrook's land. The cases in the Supreme Judicial Court of Maine have no applicability to such a state of facts. Clearly Holbrook cannot be heard in court to say that this mortgage in question is a mortgage of real estate, when he himself holds the title to the real estate. Under the legal aspect of the case, the mill, when erected, must have become a part of the realty.

In Milton v. Colby, 5 Metc. (Mass.) 78, it was held that:

"Where A., the owner of land, agrees to sell it to B., and to convey it to him by deed when B. shall erect a house thereon, and B. agrees to erect a house thereon, and that he will, on receiving a deed of the land, mortgage it to A. to secure the purchase money, B. does not, by erecting the house, acquire any property therein, but the same becomes a part of the realty; and a mort-

gage of the house by B. before he receives a deed of the land conveys nothing to the mortgagee."

In delivering the opinion of the court, Mr. Chief Justice Shaw said:

"The court are of opinion that the plaintiffs took no interest by the mortgage made to them by Diggles of the house in question. * * * The general rule is that the erection of a building on the land of another makes it part of the realty, and, of course, it becomes the property of the owner of the soil; and it is only in virtue of an express agreement between the owner and builder that one can have a separate property in a building, as a chattel, with a right to remove it. The agreement between these parties, so far from being such an agreement, was in legal effect an agreement that the building and soil should be united and held together as one tenement, and the security of the builders was in the personal agreement of the owner, by which they could require him, on complying with the terms of the agreement on their part, to convey the fee to them, by which they would obtain a legal title to the buildings with the soil." Hemenway v. Cutler, 51 Me. 407; Kingsley v. McFarland et al., 82 Me. 231, 19 Atl. 442, 17 Am. St. Rep. 473; Lapham v. Norton, 71 Me. 83; Westgate v. Wixon, 128 Mass. 304; Eastman v. Foster, 8 Metc. (Mass.) 19.

In the case last cited it was held that:

"A building erected on the land of one who has given a bond to the builder to convey the land to him, on his paying a certain sum within a certain time, is not the personal property of the builder, within the meaning of Rev. St. c. 74, § 5, so as to require a mortgage thereof, given by the builder to the owner of the land, to be recorded in the town clerk's office, in order to render it valid as against the creditors of the mortgagor, nor so as to cause a forfeiture of the building to the mortgagee, under Rev. St. c. 107, § 40, in 60 days after breach of the condition of the mortgage." King v. Johnson, 7 Gray (Mass.) 239; Butler v. Page, 7 Metc. (Mass.) 40, 39 Am. Dec. 757.

Under any fair consideration of the rights of the parties, it cannot be held that the mortgage was a mortgage of real estate. As to its being a mortgage of personal property, the language of Chief Justice Shaw in Eastman v. Foster, supra, seems to apply to this mortgage. It was not a pure mortgage of personal property "to be redeemed or forfeited as ordinary chattels mortgaged by the owner." In another branch of this opinion I have stated the attitude of the law in regard to unrecorded chattel mortgages. Without entering upon the question of the effect of the nonrecording of a mortgage of personal property, I do not find that there is sufficient in the case to impress the fund of $225, arising from the sale of the remnants of the mill, with an equitable lien for the benefit of the claimant Holbrook.

It should be further observed that the allowance of the claim of Holbrook to these funds has been most strenuously opposed by counsel for the other respondents, who contend that the statutes of Maine, which give a mortgagee of real estate a lien upon the insurance placed thereon by the mortgagor, have no application to the present cause, because there is no evidence that shows, or tends to show, that Holbrook ever adopted any measures to entitle him to the benefit of the statutes referred to.

It is likewise contended that Holbrook, having the fee to the real estate upon which the improvements were placed, and having taken a mortgage of such improvements, is thereby estopped from setting up that such mortgage is not a chattel mortgage, for the reason that such claim is inconsistent with the language of the mortgage and the rights

of the parties thereunder. With equal earnestness, they urge that this court should apply the rule, which is frequently adopted in the federal courts, that, when the language of a contract is ambiguous, the practical interpretation of it by the parties is entitled to great, and sometimes to controlling, influence. District of Columbia v. Gallaher, 124 U. S. 505, 8 Sup. Ct. 585, 31 L. Ed. 526; Constable v. National Steamship Co., 154 U. S. 51, 14 Sup. Ct. 1062, 38 L. Ed. 903; Topliff v. Topliff, 122 U. S. 121, 7 Sup. Ct. 1057, 30 L. Ed. 1110.

In applying this rule to the case at bar, they urge that as both Hicks, the mortgagor, and Holbrook, the mortgagee, have dealt with the improvements as if they were personal property, the court should treat the mortgage as one of that class. Great stress is also laid upon the fact that the mortgage was originally recorded in the town clerk's office at Vanceboro, and after the institution of proceedings in bankruptcy it was recorded in the town clerk's office at Calais, and it is urged that this fact shows that the parties continued to regard the mortgage as one relating to personalty. There is force in these contentions. But, in view of the conclusions which the court has reached, it becomes unnecessary to consider or pass upon them.

(b) Did Holbrook have an equitable lien upon the insurance fund? Of the $2,000 representing his claim, a large part was expended in the construction of the mill which was covered by the insurance. The case shows that, after the mortgage, there was an agreement that Hicks should insure the property for Holbrook's benefit. He was not made beneficiary in any insurance policy, as in the Young claim. There was no agreement with reference to any particular policies under which he should have the benefit, as in the claim of Blake & Co.; but there was an agreement that he should be protected by insurance. After the satisfaction of the claim of Mrs. Young in respect to one policy upon which she has an equitable lien, and after the satisfaction of the claim of Blake & Co. upon the two policies on which their claim is impressed, there still remains a balance of the insurance fund. The evidence tends to show that the agreement with Holbrook to protect him by insurance was made before the last policy was issued under which Blake & Co. claim. I allow Holbrook to have his claim upon the insurance money after the satisfaction of the claims of Mrs. Young and of Blake & Co.

My conclusion, then, is that the proceeds arising from the sale and disposition of the remnants of the mill property are not impressed with any equitable lien in favor of Mynia A. Young, W. L. Blake & Co., Arabella Hicks, or Edward A. Holbrook; but, for the reasons which I have given, they vest in the complainant as trustee in bankruptcy.

In accordance with the foregoing opinion, I hold that Mynia A. Young has an equitable lien upon the fund arising from the adjustment of the insurance under policy No. 6,603,308 in the Liverpool & London & Globe Insurance Company, for the amount of her claim and interest thereon, amounting in all to the sum of $763.20; that W. L. Blake & Co. has an equitable lien upon the fund arising from the adjustment of the insurance under policy No. 6,603,363 in the Liverpool & London & Globe Insurance Company, and under policy No. 13,971 in the Capital Insurance Company, for the amount of its

claim and interest thereon, amounting in all to the sum of $723.70; that Edward A. Holbrook has an equitable lien upon the balance of the fund arising from the adjustment of the insurance, after payment of the above sums to Mynia A. Young and W. L. Blake & Co.

Arabella Hicks is not entitled to any equitable lien or other rights in the fund, and, as to her, the bill will be dismissed.

The prevailing parties will recover the costs of the depositions taken in support of their respective claims; but no other costs will be allowed.

A decree may be drawn in accordance with this opinion.